IN RE ESTATE OF MARY S. WORKMAN, Deceased.

**WILLS: Construction—Unproved Codicil—Effect.** An unproved and
1    unintroduced codicil to a will can have no possible bearing on the construction of the original will which is under contest.

**APPEAL AND ERROR: Harmless Error—Exclusion of Evidence**
2    **Otherwise Brought Out.** Error cannot be predicated on the exclusion of evidence pertinent to the issues when such evidence was elsewhere or otherwise fully brought out. So held in a will contest, where effort was made to show the execution of other instruments at the same time the will was executed, and where certain witnesses were at times prevented from testifying to the appearance of testatrix, etc.

**WILLS: Validity—Evidence—Declarations Impeaching Will.** Obser-
3    vation, *arguendo*, is made that declarations impeaching the validity of the will in question, made by a testator, subsequent to the execution of a will, and at a time when testator's mind was seriously affected by disease, are incompetent.

EVIDENCE: Opinion Evidence—Wills—Apprehended Contest. An opinion based neither directly nor indirectly on any fact disclosed by the evidence is manifestly irrelevant. So held in a will contest involving the exercise of undue influence, where a witness attempted to repeat (not by way of impeachment) the conversation of another party, wherein such other party expressed the opinion that a contest was brewing, etc.

EVIDENCE: Opinion Evidence—Wills—Unsoundness of Mind—Preliminary Detail of Facts. Soundness of mind is the rule; unsoundness, the exception: therefore, a non-expert witness is not competent to express an opinion that a person is of unsound mind until he has first detailed facts and circumstances observed by him with reference to the person in question which, in at least some slight degree, tend to show that the mind of such person is unbalanced, abnormal or insane. *Held*, the competency of the witness was shown, and the rejection of the opinion was error.

WILLS: Validity—Unsoundness of Mind—Opinion Evidence—Detail of Facts—Scope. The facts and circumstances detailed by a non-expert witness with reference to a testatrix (whose soundness of mind is in issue), as preliminary to the competency of such witness to express an opinion that such testatrix was of unsound mind, may, in case testatrix was suffering from a slowly progressive disease, cover a time both *before* and *after* the execution of the will.

WILLS: Validity—Unsoundness of Mind—Inequitableness of Will—Wealth of Contestant As Explaining—Competency. It is competent to show the wealth of the contestant as explanatory of the small bequest made to him.

EVIDENCE: Opinion Evidence—Will Contest—Manner of Talk of Deceased. One may properly testify that he saw no incoherency in the talk of a certain person.

EVIDENCE: Opinion Evidence—Sanity—Basis for Opinion—Competency. One who has known the person in question for a long time and has never known anything unusual, either in speech or action, is competent to give an opinion that such person is sane.

WILLS: Validity—Unsoundness of Mind—Evidence—Financial Habits of Deceased. The custom of testatrix to promptly pay her bills may properly be shown in explanation of the fact that checks were frequently drawn by testatrix during her sickness and delivered to others.

WITNESSES: Impeachment—Collateral Matters—Cross-Examination. One may not impeach a witness on collateral matters drawn out on cross-examination.

**APPEAL AND ERROR:** Review—Exclusion of Question—Necessity
To Show Prejudice. He who has his question excluded should make an offer as to what he expects to prove, the purpose not otherwise appearing.

**WILLS:** Validity—Unsoundness of Mind—Evidence—Injustice and Unreasonableness of Will—Instructions. The injustice and unreasonableness of a will, while not sufficient, *of itself*, to overthrow the will, yet is a fact, in and of itself, bearing directly on the question of unsoundness of mind of testator, and must be so considered by the jury. An instruction which, in substance, directs the jury to entirely withhold consideration of the unjust features of the will unless they find the testator to be of unsound mind, works an entire withdrawal of such element from the jury, and is essentially incorrect.

**TRIAL:** Instructions—Conflicting Instructions—Effect. An instruction entirely correct is neutralized by one entirely incorrect on the same subject. So held where the court gave both correct and incorrect instructions on the consideration to be given to the unjust and inequitable features of a will.

**TRIAL:** Instructions—Undue Prominence To Issues—Justification. It is not improper for the court to give great prominence, in correct instructions, to matters which the parties to the litigation have made prominent. So held with reference to the definition of "unsoundness of mind" in a will contest.

**WILLS:** Validity—Unsoundness of Mind—Mental or Physical Weakness—Instructions. An instruction that "mere mental or physical weakness is not unsoundness of mind" is misleading and erroneous, when not accompanied by some proper explanation as to what the court means by such "weakness".

**TRIAL:** Instructions—Conflicting Instructions—Effect.

**WILLS:** Validity—Undue Influence—Withdrawing Question from Jury—Evidence. Evidence reviewed, and *held* error for the court to withdraw from the jury the question of undue influence.

*Appeal from Greene District Court.*—F. M. POWERS, Judge.

THURSDAY, FEBRUARY 17, 1916.

CONTEST on the probate of a will. Verdict and judgment for proponents. Contestants appeal.—*Reversed.*

*Church & McCully* and *J. A. Henderson*, for appellants.

*Wilson & Albert*, for appellees.

GAYNOR, J.—On the 19th day of February, 1912, there was filed in the office of the clerk of the district court of Greene County certain written instruments purporting to be the last will and testament of Mary S. Workman, deceased. These instruments consisted of two separate documents, one purporting to be her will (which, for convenience hereafter, we will call the original will), dated May 20, 1911; the other purporting to be a codicil to the will, dated January 26, 1912. The will provided:

1. For the payment of her debts.

2. A bequest to her brother, James Thompson, of $50.

3. A bequest to her brother, Samuel Thompson, of $700.

4. A bequest to her brother, Joseph Thompson, of $600.

5. A bequest to her sister, Margaret Hill, of $500.

6. A bequest to her nephew, John F. Thompson, of $200.

7. A bequest to her niece, Martha Hoyer, of $200.

8. A bequest to the Methodist Episcopal Church of Grand Junction, of $300.

9. A bequest to Grand Junction Cemetery Association, of $50.

10. A bequest to her sister, Ellen A. Zellhoeffer, of all her household goods.

11. "All the rest and residue and remainder of my estate which I now own, may acquire, or shall die seized, or possessed, I give and bequeath to my brothers, Joseph and Samuel, and to my sister, Ellen Zellhoeffer, the same to be divided equally among them, share and share alike."

F. J. Harned was nominated as executor of the will. The codicil made no change in the original will, except in the 11th clause, and the only change in this clause lies in adding the name of Margaret Hill as residuary legatee with the others named in the said clause.

Afterwards, on March 25, 1912, Joseph, James and Samuel Thompson, brothers of Mary S. Workman, appeared and filed written objections to the probate of the will, basing

their objections upon two grounds: (1) That, at the time of the execution of the will, Mary S. Workman was not of sound and disposing mind, but was incapacitated to make a will; (2) that the purported will was procured and executed by fraud, duress and undue influence, exercised by Ellen A. Zellhoeffer and Bertha E. Zellhoeffer, sister and niece respectively of the testatrix. They urged the same objections to the codicil.

I. A trial was had to a jury upon the issue thus tendered. Upon the trial, the due execution of the will was proven by the witnesses to the will, and the will was offered in evidence. The execution of the codicil was not proven, nor was any evidence offered to show that the alleged codicil was executed by Mary S. Workman or witnessed, as required by law. It was not introduced in evidence. Proponents disclaimed any rights based upon the codicil, nor was any proof offered to show that it was a codicil to the will. Contestants objected to it on the ground that Mary S. Workman was not of disposing mind at the time the codicil was made; objected to it on the ground that it was the result of undue influence exercised upon her mind.

1. WILLS: construction: unproved codicil: effect.

This so-called codicil appears to be dated 8 months after the execution of the will. It was not shown to have been executed and witnessed as required by law, and, not having been offered in evidence, was not before the court for consideration, nor is it before us now. We say this because there is some contention in this case that the will and the codicil should be construed together. There is no codicil in this case to be construed, either with or without the will. Neither party placed it in the record. So far as this record is concerned, the codicil is a dead piece of paper. It was filed as a codicil, but no proof was offered which gave it life as such. In fact, proponents disclaimed any right under this so-called codicil and conceded that, under the showing made, it was not entitled to probate, thus accepting contestant's contention

touching the codicil.  The cause was tried upon the issues involving the original will alone, and with this alone we have to deal.  At the conclusion of the testimony, the court withdrew from the consideration of the jury the question of fraud and undue influence, and the cause was submitted upon the question of testamentary capacity alone.  Upon the issue thus tendered, the jury returned a verdict for the proponents and from this contestants appeal, and assign 75 errors committed by the court in the progress of the trial, which, for convenience and brevity, they subdivide into 39 points, on each of which they rely for reversal.  In the view we take of this case, it will not be necessary for us to review separately the points relied upon.  They may be grouped into three general classes:

    1.   Error in the admission and rejection of evidence.

    2.   Error in the instructions given by the court.

    3.   Misconduct of counsel.

Many of the errors alleged to have been committed by the court in the admission and rejection of evidence should not have been urged here at all, for the reason that an examination of the record discloses that many of these errors were cured by the court on its own motion, in its rulings during the progress of the trial.

2. APPEAL AND ERROR: harmless error: exclusion of evidence otherwise brought out.

It was claimed by contestants that Mary S. Workman executed certain deeds to her sister Ellen Zellhoeffer and to her sister's children on the same day and at the same time she executed the will, and as a part of the same transaction. The scrivener who wrote the will, and who is executor of the will, was asked, when upon the stand, whether or not there were any other instruments executed at the time the will was executed.  Objection was sustained to this question.  Bertha Zellhoeffer, niece of the testatrix, was asked whether or not she was one of the grantees named in one of these deeds.  Objection was sustained.  On these rulings, error is predicated.

Of course, it was right to show, by competent evidence,

that, at the time of the making of the will, the testatrix con-
veyed a large portion of her property to these parties who
were charged with having exercised undue influence over
her in the making of the will, and as tending to show an
unfair and unnatural disposition of the property; but what-
ever error there might be in this was subsequently corrected
by the court in the admission of certified copies of those deeds,
in which all the facts sought to be elicited by the questions
were made more manifestly to appear than could have been
done by the answers objected to, and, therefore, the error,
if any, was without prejudice.

It is alleged that the court erred in sustaining objection
to a question asked one of the contestants, Joseph Thompson:

"Q. Did you observe the expression upon her face and
know what that indicated? A. Discouragement."

This answer was stricken out on motion of proponents.
The witness, however, was permitted to say:

"The expression of her face and her appearance showed
signs of pain, anguish and distress. When she was not sick,
she was of a cheerful disposition. She looked very frail and
pale, reduced in weight, her eyes set further back in her head,
her lips were of a redder nature than natural. Her face was
swollen. Her general appearance showed weakness. Basing
my opinion on what I have detailed in my testimony, I would
say she was of unsound mind."

Error was predicated upon the action of the court in
sustaining objections to questions and striking out answers
given by one James P. Davis, called by contestants. Before
the question was asked, he detailed at some length what he
observed in her conversation at the time he saw her, as com-
pared with her conversation in times of health, her condition
of flesh, her inability to hold her mind on conversations, and
many other things. The question was asked him:

"Basing your answer upon the same facts and circum-
stances, was she or was she not of sound mind?" He

answered: "I would have to state that her mind was not strong, by reason of her wasted condition and decline of health, but to say that her mind was unsound, I don't know to what extent that would go. Well, I don't believe she was capable of transacting business of any great importance."

On motion, the last part of this answer was stricken out.

The question was subsequently asked him:

"And her actions. She did not act as she did when she was well and before she went away?" Witness answered: "I consider her actions as those of a weak woman. Her mind as well as her body. I don't think she was unsound, by any means. I simply mean she was not in a condition to transact business matters of any importance."

This answer remained, and cured whatever error there was in the previous action of the court.

James Thompson, witness for contestants, on direct examination having described in a general way the appearance and manner of the deceased, was asked the following question:

"Q. What is the fact as to whether or not, while she was there, she appeared to be unsettled in her thought about her property? (Objected to and sustained.)" He then stated: "I never saw any improvement in my sister's condition after she returned to Grand Junction." (It appears that the will was executed about a week after her return.) He was then asked this question: "Basing your answer upon what you described in your testimony, and this statement alone, what do you say as to the mental condition of your sister on the 20th day of May, 1911? Was she normal or otherwise? (Objection renewed and overruled.) A. It was not."

This was a clear antidote to the poison complained of.

Mrs. Goodwin, called as a witness for contestants, after describing Mary Workman's condition as she observed her the day after her return from New Mexico, was asked this question:

"Did her appearance indicate any change in her health

as to what it was when she first came back? A. She was here quite a while before she seemed to get over the change of climate.''

This answer was stricken out. On this, error is predicated. She, however, had been asked and had answered this question:

''You may describe her condition as you saw her on that day. A. Her face was bloated and her body was bloated, and she was not herself. Her eyes were dull, and she seemed unable to hold them open. My sister, Mrs. Hoyer, was taking care of her at the time. Her condition, as compared to what it was before, was very poor.''

The error complained of, if any error was made, could not possibly have prejudiced the contestants. The witness had fully detailed the facts within her observation, touching the matter inquired about. However, when recalled for further cross-examination, she testified:

''After Aunt Mary returned from New Mexico, she just gradually kept going down all the time. I couldn't see that she got any better. I was over there every day, or every other day. Sometimes she told me she wasn't able to talk.''

Error is also predicated on the refusal of the court to allow this Mrs. Goodwin to testify to a conversation she had with the testatrix about two weeks before she died, and about eight months after the will was executed. If 3. WILLS: valid-ity: evidence: for no other reason, the statement was too declarations impeaching vague and indefinite to be received in evi-will. dence. Further than that, it was an effort to impeach the will by showing declarations made by the testatrix long after the will had been made, and at a time when it is conceded by both parties that her mind had become seriously affected by the disease under which she was laboring at the time the will was made. However, the court did not rule upon this objection and the answer remained, and nowhere does it appear in the record, so far as we have been able to find, that the court excluded this evidence from the con-

sideration of the jury, though we think it might rightly have
done so.

The same witness, Mrs. Goodwin, was asked to detail a
conversation had with Bertha Zellhoeffer about a week after
the making of the will. She answered: "She
said there would be one more fight and it
would be a bitter one." The same witness,
Mrs. Goodwin, was then asked: "Did she
say anything about the relatives not taking care of her?
A. She said there were not any of them came to do anything
for her, but when Aunt Mary was dead, they would all come
to see what they were going to get."

4. EVIDENCE:
opinion evi-
dence: wills:
apprehended
contest.

On motion of proponents, the court struck out both these
answers. This ruling was essentially right. The answers were
the opinion of Bertha Zellhoeffer, based upon no facts dis-
closed by the evidence, and were not relevant in any way to
the issues tendered.

Complaint is made of the action of the court in not per-
mitting the witness Morey to answer the
following question:

"Basing your answer upon what you
have related in your testimony, would you
say that, on the 20th of May, 1911, Mrs.
Workman was of sound or unsound mind?"

5. EVIDENCE:
opinion evi-
dence: wills:
unsoundness
of mind: pre-
liminary detail
of facts.

Leading up to this question, the witness had testified that
he had known Mrs. Workman for a good many years; had
often seen her; had conversations with her when her husband
was living; that he met her twice after she came back from
the south. The first time, she was sitting on the porch. He
opened the gate and went in and chatted with her. Thinks
that he did not talk with her during her sickness before she
went to Mexico. Talked with her previous to her illness.
Talked with her ten days or two weeks after she returned
from Mexico. She was changed in her appearance as to what
she was before she went away; was in a broken-down condi-
tion; was nervous, looked weak. Her conversation was not

connected or continuous, as it had been formerly; she changed from one subject to another so much; she did not follow a continuous line of conversation. The general trend of conversation was touching her condition. He would say to her, "I think you will be better", and her response was that he did not know how much she was suffering; that at no time during these conversations was she cheerful or jovial.

We think that, with this showing, the witness should have been permitted to answer, and there was error in rejecting his testimony. This was not cured by any subsequent action of the court. The general rule is that a non-expert witness cannot be permitted to give an opinion as to mental condition without first detailing facts observed by him which tend, at least, to disclose that the mind is not working normally— without disclosing something that shows that the party whose sanity is inquired about is not conversing or acting in a normal manner. Many things cannot be shown by mere description of a person. Many things observed cannot be clearly told or expressed in words; yet there must be something seen or observed and related which shows an abnormal or unnatural condition of mind. What is necessary to be shown in order to lay the foundation for non-expert opinion upon sanity has been so frequently discussed by this court that it hardly seems necessary to review the holdings of this court upon that question. It is not necessary that the conditions observed be observed on the very day that the will is executed, nor that the observations were all prior to the execution of the will. Of course, there is a large measure of discretion left to the court, but this must be sound judicial discretion. The court cannot, under the disguise of discretion, deny to a party evidence to which he is entitled and which may have probative force upon the issue tendered. However, the rule is very well expressed in *Lamb v. Lippincott*, 115 Mich. 611, as follows:

6. WILLS: validity: unsoundness of mind: opinion evidence: detail of facts: scope.

"Sanity is the rule; insanity, the exception; and when it appears that a witness has known a person for a long time and has never known anything unusual, either in his speech or actions, he is competent to express an opinion that the man is sane, because sane or normal acts and speech are consistent with the normal condition, sanity. Insanity, however, not being a normal condition, before one is competent to say that another is insane, he must state some fact that is inconsistent with sanity; and this is not done until the witness is able to testify to something that the man has said or done which fairly tends to show insanity."

As said in *Stutzman v. Sharpless,* 125 Iowa, at page 340:

"The facts on which an opinion that the deceased's mind was unsound, should appear in their natures somewhat inconsistent with mental soundness, as that the acts or talks of deceased were unnatural or unusual, or such as would not ordinarily be anticipated from a person of his character. In other words, the facts and circumstances must have been such as tended to support the witness's conclusion. . . . Undoubtedly, the witness must have enjoyed adequate opportunity of observing deceased's capacity, but habits of observation, as well as conditions of the subjects of investigation, differ so radically that no general rule as to what character or number of circumstances shall be related before the witness may speak his opinion can be laid down.

"Having indicated some facts which tend to support the opinion to be given, the witness should be allowed to express it, and its value, as well as the effect thereon of any explanatory circumstances, . . . is for the determination of the jury, rather than the court."

See also *Alvord v. Alvord,* 109 Iowa 113.

In a case like this, where the disease is slowly progressive, it is not necessary that the observations upon which the opinion of insanity was based were had at the time the will was executed or immediately before. It may be shown im-

mediately afterwards, if the condition out of which the ulti-
mate insanity grew existed at the time the observation was
made. Here it is practically conceded that the disease under
which the testatrix was laboring was progressive. It is prac-
tically conceded that she was incompetent to make a will eight
months after the making of the will in controversy; therefore,
it is proper to show her condition immediately before and
after the making of the will. This conclusion is supported in
*Ashcraft v. De Armond*, 44 Iowa 229. In the *Ashcraft* case
it is said:

"It is not denied that, at the time of the trial, her reason
was gone and she was totally incapacitated for any intelligent
action. Her insanity seems to have been of slow growth,
running back through some eight or ten years. Under these
circumstances, we are not prepared to say that it was improper
to show her condition of mind through the whole period in-
quired about. It was part of the history of her case, to be
known throughout, in order to form an intelligent judgment
as to her condition at the time of executing the deeds. It
would be otherwise if her insanity were temporary · in its
nature, as where it was occasioned by the violence of disease,
or she was subject to lucid intervals."

· It has been held that non-expert witnesses must speak
from their own personal observation or knowledge, and must
state, so far as they are able to do so, the reasons upon which
their conclusions are founded. The jury are entitled to have
before them the means of testing the accuracy of the opinion,
and the witness must state the facts upon which he bases his
conclusion. When the witness has stated the facts and cir-
cumstances observed by him, tending even though in a slight
degree to show the mind to be unbalanced, abnormal, insane,
he may then state his opinion, based upon such observation.

We think this rule was also violated in the examination of
Mrs. Allen. She should have been permitted to give her
opinion, based upon her observation, touching the sanity or

insanity of testatrix. The court erred in excluding her testimony when offered on this point.

7. WILLS: validity: unsoundness of mind: inequitableness of will: wealth of contestant as explaining: competency.

Error is predicated upon the action of the court in allowing Joseph Thompson, one of the contestants and a brother of testatrix, to show that he was worth $150,000. This was competent as explaining, or tending to explain, the reason the testatrix had, or what might have actuated her, in not making a larger allowance in her will or in the disposition of her property for this brother. We see no error on this point.

Error is alleged in the action of the court in permitting Bertha Zellhoeffer, a niece of testatrix, to say, in answer to a question, that, in a conversation she had with the deceased and in conversations had in her presence, she did not see any incoherency in her talk. This testimony was given in support of the will. This was for the purpose of showing that she was not insane at the time of the making of the will. She had testified that she was 34 years old, and had resided with her mother across the street from the home of the deceased longer than she could remember; that, during her childhood, she visited deceased on an average of once a day; that she ate at her table frequently, and deceased ate at her mother's table. She was with deceased during all the time of her illness, and was with her in New Mexico when she was there for her health. Having been called to testify in behalf of those who were contending that the testatrix was sane, she was competent to give an opinion without stating the facts upon which she based her opinion, as is indicated in a rule hereinbefore announced. She was also permitted to say, over the objection of contestants, that, after Mrs. Workman returned from New Mexico, up to the 20th day of May, 1911, she saw nothing in Mrs. Workman's conversations with her, or in any conversa-

8. EVIDENCE: opinion evidence: will contest: manner of talk of deceased.

9. EVIDENCE: opinion evidence: sanity: basis for opinion: competency.

tions had in her presence, to indicate any change in her mental condition from what it had been in her healthy life. There was no error in the admission of this testimony.

It appears on the trial that, after Mrs. Workman was taken sick, Bertha and her mother, Mrs. Zellhoeffer, received checks from Mrs. Workman for the purpose of paying bills; that Mrs. Workman gave her money and directed her what to do with it. She was then asked: "Do you know what Mrs. Workman's custom was as to keeping her bills promptly paid?" This question was objected to and objection overruled. We see no error here. It was simply in explanation of the fact that checks were frequently drawn for this purpose and given to Mrs. Zellhoeffer and her daughter to use in payment of bills.

10. WILLS: validity: unsoundness of mind: evidence: financial habits of deceased.

Error is predicated upon the action of the court in not allowing certain witnesses called by contestants to detail a conversation claimed to have been had with Guy W. Zellhoeffer, nephew of the deceased, in which it was claimed that he said that Mrs. Workman did not know she had property in Dakota. It was claimed that it was in contradiction of testimony given by the boy. This conversation was drawn out on cross-examination of the witness Guy W. when on the witness stand, and was wholly collateral to any issue. It is elementary that one cannot impeach a witness on collateral matters drawn out on cross-examination.

11. WITNESSES: impeachment: collateral matters: cross-examination.

There are some minor matters complained of in the evidence, but the record does not disclose, in many cases, what was sought to be shown by the witness interrogated, and in other cases, the matter was irrelevant to any issue tendered. No affirmative error is shown or can be gathered from this record in the action of the court. It must appear that the matter excluded would, if permitted, have been of some service to the contestants before

12. APPEAL AND ERROR: review: exclusion of question: necessity to show prejudice.

we can say that there was any reversible error committed in its exclusion. This we cannot find.

II.   It is next contended that the court erred in its instructions to the jury.

While it is true that the mere fact that the will is inequitable in its provisions does not defeat the will,

13. WILLS: validity: unsoundness of mind: evidence: injustice and unreasonableness of will: instructions.

yet that is a fact to be considered, with all the other facts in the case, in determining whether or not the testatrix had a fair conception of her relationship to her property and the objects of her bounty. The failure to provide for one who is shown to have been near and dear to the testatrix, and who had claims upon her bounty, may, in the absence of any rational reason for the omission, be considered in determining the mental status of the testatrix, but it is not sufficient, in and of itself. One has a right to make such disposition of his property as he sees fit. He may have reasons which, to himself, appear to justify his act in omitting from his bounty those who ordinarily would appear to be worthy subjects of such bounty. It is a fact, however, to be considered by the jury, with all the other facts, upon the ultimate question. As bearing upon this question, see *Hardenburgh v. Hardenburgh,* 133 Iowa 1; *Bever v. Spangler,* 93 Iowa 576; *Mileham v. Montagne,* 148 Iowa 476. In the last named case, an instruction was approved, reciting:

"The apparent inequality or inequity in the provisions of a will will not alone warrant the presumption of mental incapacity, but they may and should be considered as circumstances in connection with other facts bearing upon the condition of the testator's mind at the time of executing the will."

The court in this case instructed the jury as follows:

"The fact, if it be a fact, that such instrument, offered as the last will and testament of Mary S. Workman, deceased, may be considered by you as unreasonable, should not, of itself, be considered by you as *any evidence* that Mary S. Workman was of unsound mind at the time she executed said instrument."

This is clearly erroneous, and in violation of the rule hereinbefore set out.

The court in another instruction said:

"You are instructed that the fact, if it be a fact, that the will is not as you would have it must not control you in arriving at your verdict. However unjust you may regard the will in its provisions, still you will not set it aside for that reason alone, nor let it have any weight with you, unless you find from the evidence and instructions that the will is, as a whole, invalid, because of the unsoundness of the mind of Mary S. Workman."

The fact that the will is unjust and inequitable, that the testatrix omits from the subjects of her bounty those who are apparently as much entitled to receive at her hands as those for whom she makes provision, is a fact to be considered, in and of itself, in determining whether or not she had, at the time of the making of the will, a rational conception of her relation to the subjects of her bounty. It is a fact to be considered, in and of itself, as having some probative force upon the ultimate issue. It is error to say that these facts cannot be considered as any evidence, unless the jury is satisfied that the administratrix was of unsound mind at the time she made the will. It is error to say that this kind of evidence is not to have any weight with the jury, unless the jury first finds from the evidence and instructions that the will, as a whole, is invalid, because of the unsoundness of the mind of the testatrix. The practical effect of these instructions is to withdraw from the jury the consideration of this evidence and its probative force upon the ultimate issue, unless they are first satisfied that she was of unsound mind. Of course, if she was of unsound mind to such an extent that she was wanting in testamentary capacity, the will would be set aside, even though it were equitable in its provisions. If she were of unsound mind at the time of the making of the will, the fact that the will was equitable in its provisions would not sustain the will; for, without testamentary capacity, without the

power to rationally comprehend her property interests and the subjects of her bounty and the disposition she desired to make of it, whatever might be written and signed by her could not be said to express her last will touching the disposition of her property. Therefore it follows that an instruction which says to the jury that the fact of inequality should not be considered as evidence of unsoundness of mind, unless it is shown that she was unsound in mind, practically withdraws the consideration of this evidence from the jury altogether. A party of sound, disposing mind, possessing testamentary capacity, may make a will unjust and inequitable in its provisions, and still the will will stand. A person of unsound mind, one wanting in testamentary capacity, cannot make a will, though the provisions of the instrument offered as his will seem just and equitable in their parts. A will is not to be defeated because it is unjust or inequitable in its provisions, and is not to be sustained because it is just and equitable in its provisions; but these are facts to be considered by the jury in determining the ultimate question as to whether or not the party, at the time of making the will, possessed testamentary capacity. The normal human mind acts rationally, and has a just sense of proportion. The doing of unjust and unreasonable things, things inconsistent with the life and purpose of him who acts, as shown by his previous life, is indicative of abnormal conditions of the mind. It indicates a lack of rational conception of the act undertaken or performed. These considerations are not controlling, but they are worthy of consideration and have probative force upon the ultimate question as to whether or not the mind was normal or otherwise at the time. It is true that, in another instruction, the court said:

14. Trial: instructions: conflicting instructions: effect.

"While the fact, if it be a fact, that the will in question may appear unnatural or unreasonable, this alone should not be considered as evidence of an unsound mind; yet

you may consider such circumstance with all the other facts and circumstances in the case, in determining the soundness or unsoundness of the mind of Mary S. Workman.''

These instructions were inconsistent with each other. The first appeared in the 3d instruction; the second proposition, in the 9th instruction; and the last proposition, in the 11th instruction.

It is further complained that the court gave undue prominence in its instructions to its definition of unsoundness of mind. The definition is not complained of. We see no error in making prominent such an important matter as this. It simply stated the rule of law, and did not invade the province of the jury touching the facts essential to establish a condition which brought it within the rule.

15. TRIAL: instructions: undue prominence to issues: justification.

It is next urged that the court erred in its 24th instruction to the jury, in which it said:

''Mere mental or physical weakness is not unsoundness of mind, and you should not find the testatrix of unsound mind merely on proof of mental or physical weakness alone.''

16. WILLS: validity: unsoundness of mind: mental or physical weakness: instructions.

As an abstract proposition, this is true, but it is very misleading. Insanity involves mental weakness. Mental weakness may exist to a point where testamentary capacity ceases. What is meant by mere mental weakness, the court does not define. If the court meant to say that mental weakness was not unsoundness of mind, no matter to what extent it is shown, and that mental weakness will not destroy testamentary capacity, no matter to what extent it is shown to exist, then the court is wrong. This was the very point at issue. Had mental weakness extended to a point where testamentary capacity ceased? Physical weakness would not incapacitate unless such mental weakness is shown as a resultant condition of the physical weakness. To say to the jury that mental weakness, no matter to what extent it involves the power of rational reasoning,

does not show unsoundness of mind, is to carry the point beyond the limit of fact. It is true that the court followed this, in the 25th instruction, with the statement:

"Had Mary S. Workman, at the time she made the will in controversy, sufficient mental capacity to understand in a reasonable manner the nature and effect of her acts or the business she had under consideration, is the practical question for you to determine."

This, in connection with what preceded, amounted to saying that mere mental weakness would not destroy her capacity to understand in a reasonable manner the nature and character of her acts, or the business she had under consideration.

17. TRIAL: instructions: conflicting instructions: effect.

The least we can say for these instructions is that they are confusing and misleading. Parties are entitled to have the law clearly expressed, so that the jury, not being lawyers, can know from the instructions what the rights of the parties are under the law. The instructions should be so worded as to avoid confusion and to lead the minds of the jury to a proper understanding of the rules of law that guide them in their deliberations. The general rule, that the instructions should be read together and considered as a whole, is a rule that we do not now intend to depart from; but where inconsistent rules are stated in the instructions, and the jury are left to follow one rule or the other,—one presenting an unsound proposition of law, and the other a sound one,—it is impossible for the court to tell upon which they rested their judgment, or which guided them to their conclusion, and, therefore, we cannot approve the instructions on the whole and ignore these misleading and conflicting statements of the court.

It is next contended that the court erred in withdrawing from the jury the question of undue influence, and withdrawing from the jury all evidence tending to establish undue influence.

18. Wills: val-
idity: undue
influence:
withdrawing
question from
jury: evi-
dence.

A careful examination of the record satisfies us that this question should have gone to the jury, under the record as made. We do not desire to express any opinion upon the evidence or the sufficiency of the evidence to sustain this contention on the part of contestants, but are satisfied, from a reading of the record, that there was sufficient to carry this question to the jury, and the court erred in withdrawing it from the jury's consideration.

It seems that, at the time this will was executed, the testatrix owned considerable property; that Mrs. Zellhoeffer and her children lived close to and were frequent visitors at the testatrix's home; that the daughter Bertha called the scrivener and directed him to bring blank deeds, and that he did so; that the will was drawn by the party summoned by the daughter; that, at the same time, he prepared for testatrix three deeds: one conveying to Ellen A. Zellhoeffer, her sister, Lots 7, 8, 9, 10, 11 and 12, in Block 68 in the town of Grand Junction; one conveying to Guy W., Bertha A. and Forest L. Zellhoeffer, nephews and nieces of testatrix, the S. E. ¼ of Section 3 and the S. E. ¼ of Section 8, in Township 105 North, Range 52 West of 5th P. M., containing 320 acres; one conveying to Bertha Zellhoeffer Lots 4, 5, and 6 in the S. W. ¼ of 33-84-29 West of 5th P. M., together with buildings and improvements thereon. The property in Grand Junction was estimated as worth $5,000; the land in South Dakota, $19,000. Deceased had about $7,000 in money. It therefore appears that a very considerable portion of her property was conveyed to the Zellhoeffer family at the time of the making of the will.

There are other errors complained of, but they are such as are not likely to occur upon another trial, and we leave the case at this point. For the errors pointed out, the case is—
*Reversed.*

Evans, C. J., Ladd and Salinger, JJ., concur.