Eli R. Reed, Appellant, v. William R. Reed, Appellee.

No. 44111.

September 27, 1938.

Rehearing Denied January 20, 1939.

774

Bump, Graeser & Bump, and Putnam, Putnam, Fillmore & Putnam, for appellant.

Lehmann, Hurlburt & Hossfeld, for appellee.

SAGER, C. J.—William J. Reed died April 3, 1926, leaving surviving his widow Sarah, and four children, two of whom are the appellant and the appellee herein. All the property in dispute was derived by the widow through the will of her husband. Much of the record deals with his estate and the controversy had therein. This testimony has no bearing on the decision of the case before us except as it discloses certain mental traits, the relation of the parties, and other features which point the direction in which the right probably lies.

In 1919 William J. Reed, with his wife, moved to Des Moines. They were joined in the household by the appellee and his wife a little later in the same year. The health and eyesight of the father failed in 1910, and he shortly thereafter became blind. Up to the time of his removal to Des Moines both sons had more or less to do with the management of his affairs, but after that time appellee seems to have had substantially sole charge thereof.

The amount of property, including the homestead ($4,800), received by the widow from her husband's estate, was estimated to be about $23,000.

Shortly after the death of the husband, on June 24, 1926, eight years before she died, the widow made a will in which she left appellant only $5. Two years later a codicil was added, in

which appellant was bequeathed the same amount. At the time the codicil was drawn, a contract was executed between the widow and the appellee whereby, in consideration of long years of faithful and loving service and support rendered by the son, and his agreement to support his mother as long as she might live, she assigned to him all her property; and appellee agreed to support and care for his mother, furnishing her everything that "may be necessary or reasonably convenient or desirable to further her welfare and happiness." Appellee carried out his contract.

Appellant says that the will, codicil, and contract were caused to be executed by the fraud and trickery of his brother (appellee) in dealing with the aged, inexperienced, and mentally incompetent mother.

The mother died in 1934, at the extreme age of 91 or 92 years. The will and codicil were admitted to probate and, so far as this record shows, have never been challenged except in the cause before us.

Under these and other circumstances to be hereafter noticed appellant seeks to prove the instruments by which appellee acquired this property void; or at least that his title is so tainted with fraud and overreaching that the burden is upon the appellee to prove that there was sufficient consideration and no undue influence—this because of the confidential relations existing between the mother and the appellee son.

We have frequently expressed ourselves on this question. In McNeer v. Beck, 205 Iowa 196, 217 N. W. 825, we said [page 198 of 205 Iowa, page 826 of 217 N. W.]:

"Mere blood relationship does not, of itself, create the legal trust or confidential relationship and change the requirement in the above regard. (Citing cases.)

"However, when there is a superiority of one over the other, a 'confidential or trust relationship,' then it is incumbent upon the 'beneficiary' under a 'deed' to rebut the presumption that the transaction was fraudulent and voidable."

See, also, Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873; Roller v. Roller, 201 Iowa 1077, 203 N. W. 41; Burger v. Krall, 211 Iowa 1160, 235 N. W. 318; Pruitt v. Gause, 193 Iowa 1354, 188 N. W. 798.

These and other cases sustain, we think, appellant's claim

that the burden of proof is upon appellee with reference to the contract. But this rule applies to the contract only. We have held that a different rule applies in matters testamentary. Pirkl v. Ellenberger, 179 Iowa 1122, 162 N. W. 791. In this case, after discussing the rule applicable to cases involving gifts or donations *inter vivos,* we said [page 1132 of 179 Iowa, page 795 of 162 N. W.]:

"In contemplation of death, however, the transaction wears a very different aspect. The property must be parted with when that event arrives. It is most natural to select for benefaction those who are nearest and dearest, whether related by blood, business, friendship or association. Men do not, in contemplation of death, ordinarily give their earthly possessions over to their enemies, nor to those in whom they repose no trust and confidence. Indeed, the closer the relationship, the greater the bond that binds, the more certain is the mind that the testator chose intelligently the objects of his bounty. That he chose one who is dear to him and excluded one who ought to be equally dear, does not cast upon the beneficiary the burden of showing that he did not procure the benefaction by the use of undue influence."

With these principles in mind we turn to the record to ascertain whether or not the ruling of the trial court was justified.

Appellant's testimony as to the unsoundness of mind of his mother is confined very largely to himself and the members of his own family, and it is far from being convincing or satisfactory. Appellant himself had very little opportunity for observing his mother and forming an estimate of her mental capacity after the year 1926. In fact, he testified that he saw her but once after that, giving as his reason why he had not seen her more often that his brother threatened to shoot him if he did not stay away. He said his mother's mind was failing; when asked about her general financial condition she said she was living on her pension and did not see how they were going to get along. He related an incident of his lying on a davenport, with his face to the wall, when his mother came in. She asked who he was and one of her granddaughters tried to tell her, but she did not seem to understand. The mother walked over to him and put her hand on him, then turned away and said: "If that is Eel (Eli), he didn't speak to me." This incident is given a different and entirely harmless meaning by one or more witnesses present at the

time. Appellant went on to say that his mother was totally lacking in business experience; that after the father lost his eyesight the mother thought he was a demon, insane, and she could hardly stand to be around him; that she came down to his house at three o'clock in the morning, wringing her hands like an insane person. This, he said, happened more times than one. Among other incidents he said he heard her praying that God would remove her husband, her son-in-law, and her daughter-in-law. This testimony loses something of its weight in the light of appellant's statement:

"I have heard that time and time again, not recently, but I can go back ten or twelve or fifteen years ago, I heard her do that. These matters occurred prior to 1926."

He testified that on another occasion (in 1922) the mother had said that her troubles began when the appellee told the father that she was entertaining men when he was not around. Another thing which finds place in appellant's testimony, and has some color of support in the testimony of one or more of his witnesses, is this: He says that his mother became, prior to 1926, a religious fanatic, and would bother the neighbors talking about religious matters. Her talk, he said, about religious principles, was "extravagant and extreme," but he does not go beyond his bare conclusion, nor does the record afford any basis from which the court could determine his qualification to pass on that subject.

The wife of appellant, speaking of the attitude of her mother-in-law, said:

"She was more anxious to tell me about the soul than anything else. She was more concerned about religion than she was really humanity here."

If the thought should have entered the mind of the trial court that the old lady may have had some excuse, if not justification, for her attitude toward spiritual matters, under the circumstances in which she was placed, it would not be the occasion of surprise to one who has examined this record.

Appellant was asked: "Basing your opinion upon the various acts and conduct and talk of your mother that you have described to the court prior to 1926, and your knowledge and your observation of her and her acts and conduct, will you state

whether or not prior to and up to 1926 she was in your opinion a woman of sound or unsound mind?'' Over objection which we regard sound he answered: ''She was of unsound mind.'' On the one opportunity he had to see her in 1929, he said he noticed no improvement in her, that she seemed more childish and harder of hearing.

Utter, a brother-in-law of appellant, with considerable opportunity for observation, said he had occasion to observe Mrs. Reed's mental and physical condition back to 1925 or 1926. He said she was generally plainly dressed; rarely went to church, though she was very much interested in religion, her conversations on the occasions of her visits to his home generally being about the Scriptures; that she made contributions to the church of which witness's wife was a member. He noticed ''different peculiar things.'' She was hard of hearing, and when he and his wife went there she did not seem to know who they were right at the time they came in. During the last four or five years before Mrs. Reed died this witness saw her about twenty-five times and he noticed a great change in her. She seemed to be getting weaker and seemed to be ''awful bad.'' He noticed a change in her mental condition, she was altogether different, seemed older and more feeble and childish. He was asked his opinion, on this testimony, whether he thought she was ''able even to manage her household affairs,'' to which he replied in the negative. Without having had any conversations with her about business or her business affairs, the witness expressed the opinion that she did not know anything about taking care of her business.

Appellant's wife had scarcely any greater opportunity of forming an opinion or describing Mrs. Reed than had her husband. Her testimony went to the effect that Mrs. Reed did not know her or her husband when she came, that she tried to tell her and ''couldn't get it over;'' that she was very childish, hard of hearing, and ''couldn't talk to her with any satisfaction;'' that she ''went off on religion, went off about her brothers first and then off on religion;'' was just like a child; sometimes she seemed to know and seemed to recognize, and ''then it seemed to fade.'' Her opinion was asked with reference to Mrs. Reed's mental and physical condition prior to 1926. Her answer was that she had not been what the witness would call normal since she left What Cheer in 1919. Her observation was that her mind had changed since that time and got worse instead of better;

that her physical condition, due to advancing age, was a little weaker all the time. She heard her once praying that her husband might die.

A son of appellant, twenty years old, had very little opportunity of seeing his grandmother, and his testimony is confined to the statement that she did not know him when they got back from Florida in 1929. The family had moved there in 1920.

This comprises, in substance, the testimony on which appellant relies on the issue of mental incapacity.

As against this is the testimony of Attorney Lehmann, who drew the codicil and contract. From his description (and it is supported by other witnesses far better qualified to testify than those who gave evidence in behalf of the appellant) the court was abundantly justified in accepting the appellee's contention. This is in part what this attorney said:

"She appeared entirely competent and normal. She was old, she was bright and alert and impressed me as being entirely competent. During this period, she told me that she had prior thereto made a will. She delivered to me a copy of the will. She told me when and where she had made the will. In these discussions with me she knew the contents of the will. She referred to her son, Eli Reed. She told me what disposition or what provision she had made for him in the will made some two years before. She showed me a copy of her earlier will. It contained a provision, I think, five dollars or ten dollars to Eli Reed, and she said that she wanted that continued."

He further said, after narrating fully his contacts and acquaintance with Mrs. Reed:

"I would say that she was perfectly competent to carry on and transact her own business and fully understood what she was doing, saving only as she was handicapped by old age, by the physical infirmity of being hard of hearing which would have made it quite difficult for her to transact normal business, but she knew what she was doing, she was bright and alert and keen."

In this connection he gave an extended description of her knowledge of what she was doing. Mrs. Reed discussed with him the matter of the will, her reasons for making the codicil and the contract; she gave very good reasons for cutting appellant off

with $5 in telling of the difficulties and the troubles of which he had been the cause. While her statement in this respect was hearsay and was receivable only as indicating the mental condition of Mrs. Reed, there is competent testimony in the record which, if believed, would tend to show that the appellant had forfeited all claim to remembrance in his mother's will.

A granddaughter who had many opportunities of seeing Mrs. Reed said she was a very religious person and had been as long as the witness could remember; she never had noticed any tendency toward what might be called insanity; she was "very bright and chipper for her age, up to the last." In the last two years of her life she changed more than she had before, grew weaker, less weight, was very poor, and very stupid.

Dr. Johnston, a practicing physician, was acquainted with Mrs. Reed since 1920, saw her every few days or few weeks, lived within a block of where she lived, and observed nothing abnormal. He regarded her as a bright and intelligent talker, but a poor listener because of her deafness. She could discuss different subjects intelligently. He observed no indications of insanity at any time.

The wife of this doctor had frequent visits with Mrs. Reed. To this witness she was perfectly normal, discussed many things, principally flowers, growing peaches, and cooking. She heard her speak of the appellee and his brother Frank very often. She seemed to love them dearly. She never heard her say much about Eli (appellant).

A second granddaughter, with much opportunity to observe, said Mrs. Reed was always alert and active, but she grew childish as she grew older, naturally, and did many childish things; but at times was just as alert as, and knew more of current events than the witness. This was right to the last. In the last two years of Mrs. Reed's life the witness noticed a change in her; that she lost weight, and slept a lot. Again, at times, she would sit up in bed and talk for an hour, and seemed as bright as anyone. There were times when she seemed more weak than at others. This witness, as well as another, gave testimony to the effect that the appellant's attitude toward his mother was not what that of a son might be expected to be.

Another witness, a neighbor, said that up to within two or three years of her death Mrs. Reed was very keen and alert, had one of the most alert, keen minds of anyone he had ever known

of that age or anywhere near it. She discussed business topics up to within a year or two of her death, had a complete and intelligent understanding of them, and could read without glasses.

The appellee's testimony supports his own claims, but we refrain from setting it out at length. He testified as to the matter of making the will and codicil and contract, and that they were made on the mother's own initiative. He testified to the conduct of his brother and his abuse of the mother.

On this record we would not be warranted in interfering with the judgment and decree of the trial court in holding that the appellant had not sustained the burden of proof on the issue of mental incompetence.

The evidence wholly fails to establish the appellant's contention of undue influence. The most that can be claimed is that the appellee had opportunity to exercise undue influence had he been so minded.

One other contention of appellant needs to be noticed, and that is the will and codicil of Mrs. Reed are immaterial to the issue and not an obstacle to recovery by the appellant, this because, as he argues, appellee does not claim any of the property which he obtained from his mother under the will or codicil. With this contention we do not agree. The will and codicil have been probated and thereunder, until set aside by proper proceeding, appellant could have no interest in excess of $5. Appellee's answer was in effect a general denial, and while he did, in his answer, refer to the will and its having been probated, he put it on the ground just stated, that thereunder appellant had no interest entitling him to bring this action. Appellant brought this action and it was for him to establish his right to relief, keeping in mind the principles above adverted to; and this he failed to do.

Being satisfied that the decree of the trial court is abundantly sustained by the evidence, the decree is affirmed.—Affirmed.

ANDERSON, KINTZINGER, DONEGAN, MITCHELL, RICHARDS, STIGER, and MILLER, JJ., concur.