In re Estate of Emma Rogers.

Claude R. Rogers et al., contestants-appellants, v. Grace B. Overton, proponent-appellee.

No. 47783.

(Reported in 47 N.W.2d 818)

628

Mᴀʏ 8, 1951.

Volney Diltz, of Des Moines, and W. W. Bulman, of Chariton, for appellants.

Hextell, Mitchell & Beving, of Des Moines, for appellee.

THOMPSON, J.—Emma Cora Rogers died a resident of Des Moines, Polk County, Iowa, on February 18, 1948. She had made the will in question here on June 30, 1944, at which time she was some months past the age of eighty years. She had been a widow since the death of her husband on December 31, 1939. The amount of property involved in the litigation over the will is not clear. There is some showing in the record that she had property, real and personal, valued at about $75,000 until about June 13, 1944, at which time she conveyed several parcels of the real estate to the proponent herein, her daughter Grace B. Overton. This, of course, diminished her estate considerably, but it was still substantial at the time of her death.

The testatrix left surviving her the above-named proponent; a son, Claude R. Rogers, one of the contestants; and eight grandchildren, of whom two, Lennice A. Overton and Rain B. Gundrum, join as contestants. Upon trial of the issues raised by the objections to admission of the will to probate, the trial court withdrew the question made by contestants' allegations of mental incapacity of the testatrix, upon the close of the contestants' evidence; and at the close of all the evidence directed a verdict for the proponent upon the issue of undue influence, ordered the will admitted to probate, appointed proponent as executrix, and taxed the costs to contestants. It is from these rulings and the final judgment of the court thereupon that this appeal is taken.

The proponent is not the sole beneficiary named in the will, but she is the major one. Special bequests totaling $1525 are made to eight grandchildren, including $25 each to the contestants Lennice A. Overton and Rain B. Gundrum. There is also a devise of a piece of real estate which had been the home of testatrix and her husband during his lifetime, and of testatrix for some years after, to the contestant Claude R. Rogers (named in the will as Claude Rogers) ; but it appears that upon the death of the husband in 1939 title to this property was in his name and that there was no administration had upon his estate, so that testatrix owned only one third, while Claude Rogers already had a one-sixth interest as one of the heirs of his father.

Contestants' major complaints are concerned with the refusal of the trial court to submit the issues of mental incapacity and undue influence to the jury. The trial of the cause in the court

below covered a month; the record is voluminous, and the able
counsel representing the contesting parties have submitted ex-
tensive written briefs and arguments in which a multitude of
facts are reviewed and numerous authorities thought to bear upon
the propositions involved are cited. The official reports of this
state, and of other states, are replete with records of "will con-
tests"; that is, litigation over the validity of wills. Often, as
here, the hostile parties are close relatives whose normal family
affection has not been sufficient to bring about an amicable ad-
justment of the differences arising when one or more are thought
to be about to receive an undue share of the estate left by a
deceased father or mother, brother or sister. Too often there is
dragged into the light of the record in these trials evidence of
filthy or revolting conduct or personal habits of the deceased,
offered to show a weakened mentality, but tending strongly also
to cast a cloud upon the memory of a once-beloved and respected
relative. In any event, the seeker after light in the decided cases
finds himself faced by innumerable differing fact situations,
resulting in holdings in dozens of cases that verdicts were prop-
erly, or should have been, directed; and an equal number in
which it was determined that causes were rightly, or should have
been, submitted to juries for their determination. A review of
the many authorities in the state of Iowa alone is not possible
within the reasonable length of an opinion, nor would it be
helpful to make the attempt. The legal propositions involved
are not difficult nor in serious dispute. Both major issues are
factual.

 I. We are of the opinion that the trial court was in
error in withdrawing the issue of lack of mental capacity of the
testatrix from the consideration of the jury. Where this issue
is involved the burden is upon the contestants to show lack of
mental capacity of the testatrix in one of these respects: (1)
To understand the nature of the instrument he is executing (2)
to know and understand the nature and extent of his property
(3) to remember the natural objects of his bounty, and (4) to
know the distribution he desires to make. If his mental capacity
is not equal to any one of these tests he cannot make a valid will.
In re Estate of Meyer, 240 Iowa 1226, 37 N.W.2d 265; In re
Estate of Ring, 237 Iowa 953, 22 N.W.2d 777; Perkins v. Perkins,

116 Iowa 253, 90 N.W. 55. 'Conversely, the law is slow to deny the right of any person to dispose of his property by will as he sees fit. No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests above set forth, will render his will invalid. In re Estate of Sinift, 233 Iowa 800, 810, 10 N.W.2d 550, 554; Perkins v. Perkins, supra. And we have often said that there must be substantial evidence of mental unsoundness in order to generate a jury question. In re Estate of Sinift, supra; In re Estate of Fitzgerald, 219 Iowa 988, 996, 259 N.W. 455, 459.

██ Also, the proof of mental deficiency must be applicable to the very time of the making of the will. Ipsen v. Ruess, 239 Iowa 1376, 1379, 35 N.W.2d 82, 85; In re Estate of Grange, 231 Iowa 964, 975, 2 N.W.2d 635, 641; In re Estate of Hayer, 230 Iowa 880, 884, 299 N.W. 431, 434. This is the question which must be determined, but in considering it, evidence of the condition of the testator's mind at other times, of his acts, expressions, appearance or statements may be received and submitted if there is a reasonable basis for the conclusion that they' throw light upon the condition of his mind at the time of making the will. It is not essential that there be evidence of the exact date of execution of the instrument if there be something in the record from which it can be reasonably inferred what the state of his comprehension was when he made the will. In re Estate of Ring, supra; In re Will of Wharton, 132 Iowa 714, 718, 109 N.W. 492, 494.

██ We turn now to the evidence on behalf of contestants which, taken in its most favorable aspect to them, may be said to show lack of mental capacity of Emma Cora Rogers to comprehend any or all of the four requirements set out above. We are not concerned with proponent's evidence here; we have to determine whether contestants generated a jury question. If so, the weight of the contravening showing made by the proponent is not important at this point; it will be for the jury to determine between the opposing testimonies.

Carl S. Missildine, a well-known and reputable Des Moines lawyer, and his wife were neighbors of the decedent for many years. Each testified as to her increasing forgetfulness in the years immediately preceding June 30, 1944. Mrs. Rogers talked

with Mrs. Missildine about the death of Mrs. Missildine's baby, but she had never had a baby. She asked about the health of Mrs. Missildine's father whom she had known very well and who had died some time before; she did not know, or had forgotten, that he had died. She had fainting spells, when they thought she was going to die. Both Mr. and Mrs. Missildine expressed the opinion that, from their observation, Mrs. Rogers was of unsound mind. The court later struck out Mr. Missildine's opinion because it thought he had based it upon a mistake in dates. While this is not likely to arise upon a retrial, we suggest that the matter of the correct dates was for the jury to determine.

Willard Howe, a friend of contestant Claude Rogers, said that Mrs. Rogers had frequent spells when she would sit and look into space; then she would brighten up and be rational for a time. She had these aberrations more frequently as time went on. She could not remember when he came to the house and would ask the same question over and over again. She would sit and pick her fingers and fingernails. The witness saw her frequently from 1939 until he went into the military service in November 1944. From December 1943 and in the early part of 1944 she got much worse and more forgetful and repeated the same question oftener. She was irrational at times as early as 1942, and grew worse until witness went into the Army in 1944. In his opinion she was of unsound mind.

John H. Miller had known testatrix for many years. He testified he saw her often in 1943 and 1944. She was forgetful and nervous; would start a conversation, then switch to another before it was finished; it was not possible to carry on a coherent conversation with her. She would catch hold of someone in order to hear; would rub their hands and kiss them. She was of unsound mind in the witness's opinion.

Mrs. Anna Munden was a long-time friend of Emma Rogers, and said she seemed very nervous and flighty from 1939 to 1944. She would start a conversation, then run off on something else. She would rub her face and start to tell the witness something, then forget what it was. In 1944 she could not finish her sentences. She would hold the witness's hand and kiss her hand for hours. The witness thought her of unsound mind.

William H. Cook became acquainted with Emma Rogers in

1942 or 1943. He testified he last saw her in November 1943; tried to talk to her several times, but she could not keep on the subject. She would get nervous—"fly all to pieces" and begin to pick her hands and stare around at something. When he last saw her in November 1943 he thought she was of unsound mind.

The contestants and their spouses tell in more detail of many eccentricities of the decedent. They say that she would pick her fingers until they bled; that she became unclean in her personal habits; that she kept cats about the house which were permitted to soil it; that she soiled her clothes and wet her clothes. At times she did not recognize her grandson, Rain B. Gundrum. She would wring her hands and rub her face. Witness R. C. Overton, husband of Lennice Overton, saw her at Grace Overton's home on February 16 or 17, 1944. When he spoke to her she looked up and made signs and did not say anything, she would try to say something but the witness could not understand her. He asked Grace Overton and her husband, Ben, what was the matter and they said she had a complete loss of memory and was just like a little baby. Witness thought Emma Rogers was "crazy."

Dr. F. A. Ely, a qualified mental expert, testified in response to a hypothetical question embracing many of the matters set out above, together with others not specifically referred to herein, that in his opinion Emma Rogers was of unsound mind on June 30, 1944. The question seems to have been reasonably within proper bounds, and the answer of the expert is of definite aid to contestants.

Emma Rogers suffered a cerebral hemorrhage in February 1945, and on February 10 of the same year a petition for appointment of guardian was filed in the district court of Polk County. A temporary guardian of her property was appointed at once, and on April 28, 1945, the court adjudged her to be of unsound mind and incapable of managing her property. J. R. McManus, a capable and experienced Des Moines attorney, who had represented testatrix and her husband for many years, was both the temporary and permanent guardian, and in the latter capacity he served until Emma Rogers' death.

It appears that the testatrix lacked a full comprehension of the extent of title and ownership which she held in the prop-

erty devised in her will to her son Claude Rogers and his wife, Mabel, in joint tenancy. This had been the home of herself and her husband, and she lived there for some time alone and later with Claude and his family after Mr. Rogers' death in 1939. It had been held in the name of the husband, and title so remained at his death. There was no probate upon his estate, so that the title devolved one third to testatrix and the remainder to Claude Rogers and the other sons and daughters. The will indicates a lack of understanding of this situation, since it attempts to devise the entire interest in the property. There was also evidence from which the jury might have found that at the time of Mr. Rogers' death in 1939 he had on his person or in his possession from $3500 to $5000 in currency, which Emma Rogers appropriated and for which she never accounted, apparently considering that it was all her property. It is true that these things may mean nothing more than that the testatrix misunderstood her legal rights; yet they are circumstances tending to show to some extent that she lacked comprehension of the full extent and nature of her property. See In re Linstrom's Will, Iowa, 175 N.W. 741, 743.

There is also the matter of the unequal and unnatural distribution among the natural objects of the testatrix' bounty. There appears no good reason, or at least the jury could have found that there was none, why Grace B. Overton should have been so much favored over her brother, and, perhaps, over the decedent's grandchildren. This is another circumstance which, while not controlling, and not in itself sufficient to support a finding of lack of mental capacity, may be taken with other matters as enough to warrant submission to the jury for its verdict.

It is impossible of course to set out in this opinion all of contestants' evidence. Enough has been referred to above to show the general trend. We feel that there was a jury question upon the issue as to whether the testatrix had sufficient mental capacity to make a valid will on June 30, 1944.

II. The second major question concerns the direction of the verdict upon the issue of undue influence. The trial court refused to withdraw this issue at the close of contestants' evidence, apparently being of the opinion that the question was

closer here than upon the allegation of mental incapacity; to put it in another way, that there was more evidence tending to support the claim of undue influence. With this we agree.

Influence such as will invalidate a will must be such as substitutes the will of the person exercising it for the will of the testator so that it cannot be said that the will in question is the testator's will. Mere opportunity to exercise influence, the will or disposition to do so, or even requests or importunities, if they do not go to the extent of controlling the will of the testator, are not sufficient to constitute undue influence. In re Estate of Brooks, 229 Iowa 485, 493, 494, 294 N.W. 735, 739, 740; Worth v. Pierson, executor, 208 Iowa 353, 223 N.W. 752; Perkins v. Perkins, supra; Cookman v. Bateman, 210 Iowa 503, 231 N.W. 301; In re Estate of Johnson, 222 Iowa 787, 798, 269 N.W. 792, 798. The undue influence must operate at the very time the will is made. See Worth v. Pierson, executor, supra, at page 359 of 208 Iowa.

The burden is upon the contestants to show undue influence, as defined by the rules above set forth. In re Estate of Brooks, supra, and cases cited. This is true, even though, as here, the contestants claim a confidential relationship existed between the proponent, Grace B. Overton, as the dominant party, and the testatrix as the subservient one. The rule as to shifting of the burden of proof in such cases does not apply to testamentary gifts. In re Estate of Brooks, supra; Reed v. Reed, 225 Iowa 773, 776, 281 N.W. 444, 445. See also other cases cited in In re Estate of Brooks at page 493. The proper rule is discussed and determined in Graham v. Courtright, 180 Iowa 394, 406 to 416, inclusive, 161 N.W. 774, 778 to 781.

On the other hand, it is well-settled that the evidence of undue influence need not be direct. In re Will of Busick, 191 Iowa 524, 530, 182 N.W. 815, 818; In re Estate of Brooks, supra. The mental strength or lack thereof of the testatrix is an important element. We said in Brogan v. Lynch, 204 Iowa 260, 264, 214 N.W. 514, 516:

"The question of undue influence, in a case of this kind, cannot be separated from the question of testamentary capacity; and conduct which might be held insufficient to influence unduly

636

a person of normal mental strength might be sufficient to operate upon a failing mind. See Monahan v. Roderick, 183 Iowa 1; In re Will of Overpeck, 144 Iowa 400; In re Will of Wiltsey, 135 Iowa 430."

This was quoted with approval and followed in In re Estate of Ensminger, 230 Iowa 80, 82, 296 N.W. 814, 815. See also Hansen v. Waugh, 237 Iowa 304, 315, 21 N.W.2d 762, 767; In re Estate of Hurlbut, 242 Iowa 353, 46 N.W.2d 66; In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318.

It is again a question of fact, and a consideration of the evidence becomes essential. We have pointed out, in Division I hereof, some of the items in the record which call for a submission of the allegation of lack of mental capacity to the jury. It goes without saying that there is therefore evidence of mental weakness of the testatrix which brings this case within the rule laid down in Brogan v. Lynch, supra, and the other cases last above-cited. The evidence referred to in Division I is pertinent here and need not be further reviewed.

There is considerable further showing on the part of the contestants which, added to the evidence of mental deterioration of the testatrix, could lead the jury to the conclusion that she was overborne by the proponent, and that the will in question was not the will of the decedent, but rather that of Grace B. Overton, the chief beneficiary. We do not hold that such is the finding that the jury should make; only that the question is for them to determine.

It appears that about April 29, 1944, while Emma Rogers was making her home with her son, Claude R. Rogers, the proponent appeared and took her away. She told no one at the Rogers home why she wanted to take her mother, nor that she expected to keep her away from her then residence for some time. She took almost none of the aged woman's clothes, other than the ones she was wearing. But in the early part of June, following, when Mrs. Rogers had been living with Mrs. Overton for some weeks, or since April 29, the proponent escorted her mother to the office of Carl Burkman, an attorney of high reputation and standing in the city of Des Moines. His office was in the same building as that of J. R. McManus, who had been Mrs. Rogers' attorney for many years. Mr. Burkman was not known

to Mrs. Rogers, nor had she ever sought or had his services before. Mrs. Overton did not go into Mr. Burkman's private office with her mother; and it is only fair to say that Mr. Burkman and the two secretaries who were present in his office testify that the testatrix appeared to be in full possession of her faculties and to know what she wished to do with her property. But this, together with the other evidence adduced by the proponent, was for the consideration and judgment of the jury. Mrs. Rogers first employed Mr. Burkman to prepare a deed, by which she conveyed some six or seven parcels of improved real estate in Des Moines to proponent and her husband. This deed was executed on June 13, 1944, and placed in escrow with a banker. The bank selected was not the one which was ordinarily used by testatrix, but was the one at which proponent and her husband did their banking business, in connection with the laundry which they operated.

At the time the deed was executed there was talk of making a will, and on June 30, 1944, Mrs. Rogers was again brought to Mr. Burkman's office by Mrs. Overton, and the will drawn and executed. It was then taken in charge by proponent and kept by her until Mrs. Rogers' death. While there were some small cash bequests and a devise to contestant Claude R. Rogers and his wife of a house and lot, of which testatrix actually owned only one third, all as pointed out before, yet Mrs. Overton received the greater part of the estate even after it had been diminished by the deed above referred to. There appears in the record no sufficient reason why Mrs. Rogers should have preferred this daughter so markedly over her son or the children of her deceased sons and daughters. There is some slight evidence of trouble between Claude Rogers and his father some years before, but it is denied, and so would do no more than raise a jury question as to whether there was any reason for testatrix' discrimination against him. In fact, she had been living at his home for some time before she was taken away on April 29, 1944; and she returned there after the deed and will were made.

The situation here is reminiscent of the facts in In re Estate of Telsrow, 237 Iowa 672, 22 N.W.2d 792. The testator in that case had been making his home with a sister, when the proponents called for him and took him to Muscatine to the office of a lawyer

unknown to him where he made the will which was contested. In the Telsrow case the will was executed on the same day, while here a period of some weeks intervened, but the proponent kept the testatrix with her during that period. The evidence in the Telsrow case showed also that proponents did not go into the attorney's inner office with the testatrix. There, as here, they took possession of the will and kept it until the death of the maker. We held in the Telsrow case that there was sufficient evidence of undue influence to make a jury issue, and the showing here is stronger. There was the same disregard of natural objects of the testatrix' bounty, and an unequal distribution of her property; and there is further to be considered the evidence showing lack of comprehension of the extent of and title to some of the real estate which she devised.

It appears also that for some years prior to the making of the will Mrs. Overton and her husband had taken charge of Mrs. Rogers' property, had rented it, collected the rents, and in general managed and controlled it. The witnesses Ruby Sharp, Martha Davidson, M. R. Henry, Fred B. Armington, and Florence Nine all tell of renting divers properties belonging to Mrs. Rogers during the years 1941, 1942, and 1943. In each case the negotiations, both as to rentals, repairs and redecorating, were carried on with Grace Overton or Ben Overton, her husband. The rent was always paid to one of them, usually to Ben Overton. Proponent and her husband say that they looked after the properties for Mrs. Rogers because it was difficult for her to move around; and that the rent was always turned over to her immediately after it was collected. Nevertheless, there was substantial evidence from which the jury could have found, if permitted to do so, that proponent and her husband had been dominant over the testatrix and her property at the time of the making of the will and for some years prior thereto. This did not change the burden of proof, which remained at all times upon the contestants, but it did add considerably to the force of their contention. Since each case of this character depends so much upon its own particular facts, it will serve no good purpose to go further into the details of the evidence. The lack of mental capacity of the testatrix, the inequitable disposition of her property, the domination of herself and her property by proponent

and her husband, her removal by them from her son's home without explanation shortly before the execution of the will, the act of Grace B. Overton in taking her to a strange lawyer, and keeping the will there made in her possession, are all circumstances which require the determination of a jury upon the question of undue influence. It may be that no one of these things, standing alone, would be sufficient to generate a jury question; but combined they form an outline which would support a verdict for contestants. We hold that the trial court was in error in refusing to submit this issue.

III. Contestants predicate error also upon the refusal of the trial court to permit the witness R. C. Overton, Jr. to testify to statements alleged to have been made by the testatrix in 1945; that is, after the making of the will in dispute. Objection to questions put to the witness having been sustained, contestants offered to prove by him that, if permitted, he would testify that he heard a conversation between Emma Rogers, the testatrix, and his mother, Lennice A. Overton, in which Mrs. Rogers said that "Grace made her make a will, and that she threatened to put her in an institution if she didn't make the will, and that was why she made it." This testimony should have been received. Passing the question as to whether it was permissible rebuttal to testimony of Grace B. Overton that she had in no manner influenced her mother in regard to the will, it was clearly proper under the rule expressed in In re Estate of Johnson, 222 Iowa 787, 798, 269 N.W. 792, 798. We there said:

"The contestants introduced evidence of statements of the testator of his intention to leave his property to persons other than the beneficiaries named in the will.

"Such declarations of the testator cannot be considered in determining whether the undue influence has, in fact, been exerted. If the fact of undue influence has been independently established, such declarations are admissible to show the testator's state of mind, his susceptibility to undue influence and his capacity to resist it."

See also In re Estate of Champion, 190 Iowa 451, 457, 458, 180 N.W. 174, 177; Graham v. Courtright, 180 Iowa 394, 404, 161 N.W. 774, 777; Johnson v. Johnson, 134 Iowa 33, 111 N.W. 430.

640

The situation here brings the proffered testimony clearly within the rule. We have held that there was independent evidence sufficient to establish undue influence, if believed by the jury.

IV. Other assignments of error deal with rulings on evidence which are not likely to arise upon a retrial.

For the reasons set forth in Divisions I, II and III the judgment of the trial court must be reversed.—Reversed and remanded.

All Justices concur.