IN RE ESTATE OF DR. M. SCANLAN, also known as DR. MAURICE SCANLAN, deceased. WINIFRED WOLFE, appellant, v. THOMAS J. SCANLAN et al., appellees.

No. 48506.

(Reported in 67 N.W.2d 5)

NOVEMBER 16, 1954.

H. L. Irwin and Don A. Sagers, both of De Witt, and Lane & Waterman, of Davenport, for appellant.

Holleran & Holleran and E. C. Halbach, all of Clinton, and William R. Mockridge, of De Witt, for appellees.

OLIVER, J.—This is an appeal from a judgment denying admission to probate of the purported will of Dr. Maurice Scanlan, of De Witt, Iowa, executed March 25, 1951, at Mercy Hospital, Davenport. He died there April 3, 1951, aged seventy-six years.

Doctor Scanlan had been engaged in the general practice of medicine at De Witt for many years. His wife died in 1943. They had no children and his only heirs-at-law were ten adult nephews and nieces, who are the objectors or contestants herein. One nephew lived on a farm, rented from decedent, a few miles from De Witt. None of the others lived near De Witt.

Decedent left a gross estate of approximately $125,000. Except for $7000 divided among eight of his heirs (two were not mentioned), the will gave all of his estate to proponent, Winifred Wolfe, a niece of his wife. Proponent had been a schoolteacher for twenty-two years. She lived in De Witt, with her mother, and taught in Rock Island, Illinois, where she had an apartment. The will of Doctor Scanlan's deceased wife had given Miss Wolfe a substantial part of the estate of said deceased wife. Some of Doctor Scanlan's heirs-at-law were in quite modest circumstances and none was affluent. The evidence of the six of them who were witnesses was to the effect their relations with decedent were friendly.

The case was submitted to the jury on the issues of lack of testamentary capacity and undue influence. The verdict found the will invalid. From judgment thereon, proponent prosecutes this appeal.

I. Doctor Marker, a physician and a specialist in psychiatry and neurology, testified for contestants. Appellant's first assignment of error is, the court repeatedly admitted, over objections, Doctor Marker's opinion testimony based in part on the opinions of others in hospital and clinical records. These objections were predicated upon the rule that an expert witness may not base his opinion upon the opinions of others. Ipsen v. Ruess, 239 Iowa 1376, 1388, 1389, 35 N.W.2d 82, and citations; Ipsen v. Ruess, 241 Iowa 730, 41 N.W.2d 658; Miller v. McCoy Truck Lines, Inc., 243 Iowa 483, 487, 488, 52 N.W.2d 62, and citations; annotation in 98 A. L. R. 1109. Appellees contend the questions put to the witness required him to base his answers upon facts (as distinguished from opinions) shown in the hospital records, which were in evidence, and upon other facts in evidence.

As stated in Cody v. Toller Drug Co., 232 Iowa 475, 482, 5 N.W.2d 824, 828: "While it is true that the opinion of an expert should not be based upon *the opinion* of another expert witness, *facts* testified to by another expert may properly be included in a hypothetical question." 32 C. J. S., Evidence, section 551, pages 347, 356; Christiansen v. Hollings, 44 Cal. App.2d 332, 112 P.2d 723, 731.

The rule appears plain, but its application is frequently difficult. In the Vanderbilt Law Review, Volume 5, pages 414, 416,

Dean Mason Ladd refers to the legalistic struggle to determine whether testimony is fact or opinion and mentions the orthodox test of whether the witness testifies from personal perception or mere conjecture. The text in 32 C. J. S., Evidence, section 438, states: "* * * 'opinion' is an inference or conclusion drawn by a witness from facts, some of which are known to him and others assumed, or drawn from facts, which, although lending probability to the inference, do not evolve it by a process of absolutely necessary reasoning."

An article in 23 Texas Law Review 109, 111, by Dean Charles T. McCormick, states the assumption that "fact" and "opinion" stand in contrast is an illusion and the difference between them is a mere difference in degree with no recognizable line to mark the boundary. Wigmore on Evidence, Third Ed., section 1919, states no distinction between opinion and fact is scientifically possible; and nearly everything we choose to call fact is or may be only opinion or inference. State v. Powell, 237 Iowa 1227, 1242, 24 N.W.2d 769, 778, notes: "The distinction between fact and opinion statements sometimes grows thin." However, the rule requires that such distinction be made in the case at bar.

 Appellant's first complaint does not involve this rule. This questioned ruling stems from a statement in one of the records: "Diagnosis, coronary sclerosis." Doctor Marker was asked: "Can you explain to the jury what is meant by that term in language that is more understandable?" Appellant complains: "Doctor Marker was permitted to testify to the meaning of coronary sclerosis, that it is a condition of hardening of the arteries and blood vessels of the heart." We hold the complaint is without merit. A witness may properly explain the meaning of any technical language in evidence, in the field in which he is an expert. Des Moines Plumbing & Heating Co. v. Magarian, 201 Iowa 647, 649, 207 N.W. 750.

The next several complaints do involve the rule, in connection with the following questions: "Q. Assuming, doctor, that these facts as set out on this record are correct and that the drugs were administered as given and that the patient did have the increase in temperature and as stated in this record, what, if any, effect would it have on the patient, his resistance or will

to resist or lack thereof? A. The patient that is suffering from a fever and that is under the influence of drugs can have their will to resist or they fail to have a will of their own. They can be able to be swayed one way or the other more easily. The very ill patient may be very agreeable or they may be very disagreeable, but they don't show that they are carrying out their own thoughtful conclusions."

In another question Doctor Marker was asked to point out any items in the hospital chart which threw light upon Doctor Scanlan's mental condition the day the will was executed and the day before, "assuming the truth of the statements as set out in such exhibits." The answer listed various matters shown in the nurse's record. "Q. From your observation of the chart does it indicate any evidence that the patient may have been in the course of the development of senility, assuming the facts to be true in the chart?" The answer referred to the age of the patient and the use of a catheter and stated, myocarditis is usually a development of old age, "so that all of those lead me to conclude that the patient was physically senile, but there is nothing in the record that says he is senile."

These questions called for opinions of the witness based upon facts found in the records in evidence and assumed to be true, and the answers of the witness indicate they were so understood by him. Hence, the objections were not well founded.

A long hypothetical question, which covered much of the evidence for the objectors, was answered by Doctor Marker; assuming the facts therein stated, Doctor Scanlan was not of sound mind on the 24th or 25th of March, 1951. Appellant complains various things assumed were matters of opinion:

The first is—that Doctor Scanlan suffered from a severe grade of anemia on March 21, 1951, with 67% of normal hemoglobin and corpuscles. This complaint overlooks Exhibit 5E, Doctor Scanlan's blood card which shows the result of tests of his blood on that date. Next—that decedent suffered from dropsy. Doctor Marker had testified: "It is reported (in the chart) that he showed edema from his hips to his toes. This is a swelling commonly called dropsy." Next—that he required oxygen inhalations, heart stimulants, bed rest, and drugs to produce unconsciousness. The hospital record shows these items

were part of the care and medication given him, apparently under the physician's orders. The word "required" assumes they were necessary. Although the use of this word is not approved it was not a serious error. Next—that decedent was very confused on March 23, 1951. Next—that he seemed to get worse physically after March 26—the correct language of the hypothetical question was, on March 26, "the patient was muttering and talking incoherently; that there was twitching of the legs and that when he had visitors he did not seem to recognize them; further assuming that after March 26, 1951, the patient continued to get worse physically and there are references in the hospital record to not responding and grumbling and moaning and convulsions up to the time of his death which occurred on April 3, 1951."

It is not contended the hypothetical question misstated the record. The complaint is, some facts assumed were merely opinions of others.

The hospital records in evidence consist of a routine report of death, the report, notes and orders of the attending physician, each of one page, five laboratory reports on cards, and the nurse's record of thirty-five pages. In the hypothetical question, aside from the blood test card from the hospital laboratory, all the facts assumed from hospital records were taken from the nurse's record. Appellant's argument appears to be based in part upon the erroneous theory records made by physicians were included. Nurse's records are kept, in the main, for the attending physician. Each page of such record is divided into columns showing temperature, pulse, respiration, nourishment, medication, and remarks. In the "remarks" column are noted the calls of the physicians and what the nurse did and perceived. Although some of the "remarks" were what are frequently called conclusions from composite facts, they appear to have been merely records of the personal perception of the nurse, couched in part in professional language and in part in the language of a layman. Statements of this nature have been considered statements of fact.

In Miller v. Miller, 237 Iowa 978, 990, 23 N.W.2d 760, 767, a witness testified his father " 'has failed terribly in the last year'." The decision states: "This was fact testimony as dis-

tinguished from opinion testimony." In Stone v. Moore, 83 Iowa 186, 188, 49 N.W. 76, 77, a witness was permitted to testify over objection: " 'I know it [plaintiff's condition]· to be one of feebleness and inability to do hard work.' " The court held this was evidence of a fact open to the observation of anyone who was familiar with the plaintiff and accustomed to observing her appearance and movements. In Manatt v. Scott, 106 Iowa 203, 212, 76 N.W. 717, 68 Am. St. Rep. 293, the court held proper a question as to any difference there was in decedent's actions or appearance indicating mental strength or weakness at the time the witness last saw her, stating: "Now, anything about the decedent indicating her strength or feebleness would be a fact, and this question calls, not for his opinion, but for the facts, as to her actions and appearance." See also Severin v. Zack, 55 Iowa 28, 30, 7 N.W. 404; 32 C. J. S., Evidence, sections 510(b), 513(b).

We hold the questioned statements in the hypothetical question taken from the hospital records were statements of fact rather than opinions, within the meaning of the rule. The trial court has some discretion in ruling upon such matters. It is our conclusion there is no reversible error in the orders complained of which overruled objections to questions put to Doctor Marker.

II. Appellant contends the evidence of decedent's lack of testamentary capacity was insufficient to generate a jury question. Various witnesses testified Doctor Scanlan failed physically and mentally the last few years of his life. He appeared childish and at times confused. In 1948 Doctor Schafer attended a patient for decedent during the latter's temporary absence. Upon his return Doctor Scanlan was unable to understand what Doctor Schafer had done and was unable to tell Doctor Schafer what he (Doctor Scanlan) had found and how he had treated the patient. In 1950 and early in 1951 he apparently was unable to discuss intelligently his income tax matters with his lawyer. He did not respond to questions and would start talking about other matters.

A patient testified Doctor Scanlan examined him and told him to return the next day. The next day, when the patient came, Doctor Scanlan thought it was for a visit. He frequently told fanciful stories about automobile wrecks and arguments,

nude people and others who aroused him at night and various other imaginary experiences. He was overheard talking to his dead wife. His condition degenerated. Within the last year he was unable to carry on a conversation. Based upon these and other incidents testified to by him, the witness expressed the opinion Doctor Scanlan was of unsound mind when the witness last saw him shortly before he went to the hospital.

Mrs. Jahncke who helped care for Doctor Scanlan's house and office testified his physical condition deteriorated steadily after the death of his brother in 1947. In later years he was unable to tell her what medicines to deliver to his patients. She testified to various fanciful stories told by decedent, similar to those recounted by other witnesses. When she was packing his suitcase March 21, 1951, the day he went to the hospital, he said to her: "Are you deep down in your house?" "I asked him what he had said, but he gave me a blank stare and smiled and said nothing further." She expressed the opinion Dr. Scanlan was then, and for some time had been, of unsound mind.

A nephew who was willed $500 testified he visited his uncle at the hospital March 26, the day after the will was executed, and each day thereafter and Doctor Scanlan did not recognize him. John Raymond Scanlan, the nephew who farmed land belonging to Doctor Scanlan, testified concerning decedent's failing mental condition and that the latter did not recognize him for four or five minutes on March 24, the day before the will was executed.

Other lay witnesses testified to his unnatural conduct and appearance. Reference has already been made to some of the testimony of Doctor Marker and his opinion decedent was not of sound mind on the 24th or 25th of March. Doctor Marker pointed to some of the items in the hospital record which threw light on decedent's mental condition, March 24 and 25. Apparently, the witness was reading from and referring to the nurse's record. He pointed out that decedent was confused, that: although he was a physician, he pulled out the catheter placed for his relief, was very restless, was under the influence of nembutal and demerol and slept frequently, probably from their effect. Physically he was in bad condition on the 24th.

He had dropsy from his hips to his toes. He was very drowsy from twelve to two that afternoon. From two to six his temperature rose from 98° to 101° showing he could have been mentally affected by fever as well as the drugs given him. That night he slept under the influence of demerol. The next morning (the day the will was signed) it was noted he seemed to have perspired. His pulse was irregular, temperature down to 99°. His edema was recorded the same as the day before. His breathing respirations were labored on slight exertion. He took a fair amount of his diet—"At noon they say he has had too much exertion. His pulse is irregular. In the afternoon there is a weak pulse, there is twitching and slight jerking of the legs when he is unconscious, sleeping. They then say he is sleeping soundly at two o'clock. The nurse notes that he has turned blue because of lack of proper circulation. His temperature is then going back up and has reached 102 at that time; between twelve and two it has gone up that much. There was no recording of the temperature from six until twelve on the 25th. The patient then is recorded several times as becoming less conscious and a gradually developing coma came on which again has not been relieved any time according to the notes that we have here, and the patient died a little over a week later."

It may be noted various lay witnesses for proponent testified concerning Doctor Scanlan and expressed the opinion he was of sound mind. The only physician-witness for proponent was Doctor Foley who was in charge of Doctor Scanlan until March 24, at 9 a.m., at which time Doctor Foley left on his vacation. Doctor Foley testified briefly, "Doctor Scanlan was of sound mind in March of 1951." The doctor who had charge of Doctor Scanlan after Doctor Foley departed was not a witness.

The burden was upon the objectors to show decedent's lack of mental capacity to make a will, in one or more of the following particulars: (1) To understand the nature of the instrument he executed (2) to know and understand the nature and extent of his property (3) to know and comprehend the natural objects of his bounty (4) to know the distribution he wished to make of his estate. In re Estate of Rogers, 242 Iowa 627, 630, 47 N.W.2d 818, 820, and citations. Under the familiar

rule, in determining this issue, the record will be viewed in the light most favorable to objectors.

Although there is dispute in the record, there is substantial direct evidence decedent's mental capacity did not measure up to the minimum standard required in any of the four essentials listed above. As bearing upon some of these propositions the jury could properly consider also whether the giving of the great bulk of decedent's estate to proponent and a relatively small share to blood relatives was an unjust and unnatural distribution, under the circumstances shown in the record. There was evidence Doctor Scanlan, at the time the will was drawn, did not know, as the record indicates he must have known previously, "that the usual way of disposing of property was through a will." Although not essential to a valid will, it may be observed also, there was no affirmative showing in the language of the will that he knew the nature and extent of his property. Nor did he discuss this with the lawyer who drew the will.

We are satisfied the evidence of decedent's lack of testamentary capacity required the submission to the jury of that issue.

III. Appellant predicates error upon the submission to the jury of the issue of undue influence. There was evidence that some time prior to Doctor Scanlan's last illness proponent wanted him to make a will but he did not do so.

Proponent visited him at the hospital the day he entered and each day for several days thereafter. She remained there all night Friday, March 23, leaving at 9 a.m., Saturday. She returned to his bedside Saturday at 5 or 6 p.m., was absent for a short time while meeting her brother who arrived from Chicago, and with him returned to the hospital. They remained there until about midnight. Sunday evening, March 25, she again went to his bedside. No blood relative of Doctor Scanlan was notified of his illness until after the will was executed. However, a nephew, John Raymond Scanlan, happened to learn of it from an outside source.

John rented a farm from his uncle, called upon him frequently, and in February at the request of Doctor Scanlan had made a trip to Davenport with him. John came to his uncle's bedside at 2 p.m., Saturday, March 24. At 2:30 Mr. Sagers, a

De Witt attorney with whom John was acquainted, entered the room. John testified: "Mr. Sagers asked if he wanted to see him and Uncle Maurice said, no, he didn't. He said: 'Did Doctor Foley send you up here?' And he said 'Doctor Foley told me that he was going to call you and I told him he had better not,' and Mr. Sagers then spoke right up and said that Doctor Foley didn't call him. He said that Winifred Wolfe called him from Rock Island that morning and told him that Doctor Scanlan wanted to see him. Doctor Scanlan said he didn't want to see him."

Mr. Sagers left the room, went to his car and pretended to depart. He testified he waited until he saw John Scanlan come down the walk before he (Sagers) returned to Doctor Scanlan's room. He denied most of John's testimony quoted above. His story was that in their second conversation Doctor Scanlan "said he wanted to turn his property over to Winifred Wolfe and let her divide it as she saw fit. Then I suggested he ought to make a will. He did not use the word will. The first time will was mentioned, I mentioned it as advice to him as a way of disposing of his property. Next I suggested he make a specific bequest to his relatives before he turned the rest over to her. * * * He suggested the amounts. * * * I told him that I had come pursuant to a telephone call from Miss Wolfe. Nothing was said about Doctor Foley." Mr. Sagers testified he returned to the hospital the next day, Sunday, March 25, and Doctor Scanlan executed the will about noon.

Reference has been made to only a portion of the evidence on this issue. Witnesses for proponent presented evidence to explain that Doctor Scanlan decided to make the will at the suggestion of Doctor Foley and said he would like it drawn by Mr. Sagers, that Doctor Foley asked the nurse to call Mr. Sagers and the nurse asked proponent to do so. Here again the record must be viewed in the light most favorable to objectors in determining its sufficiency to make a fact question for the jury.

Proponent cashed a check for $7405.54 made on De Witt Bank & Trust Co. by Doctor Scanlan, dated April 2, 1951,

and' payable to cash. The record does not show how or when she secured this check from Doctor Scanlan. The inventory of the special administrators of Doctor Scanlan's estate lists this item as a claimed asset of the estate. Objections by her counsel to questions asked proponent on the subject were ·sustained. She made no attempt to show how she procured the check. The jury could.have found a satisfactory explanation was due from proponent and its absence was a circumstance to be considered against her. We have already noted the jury could have found the distribution of testator's property under the purported will was unjust and unnatural.

This court has said: "'The question of undue influence, in a case of this kind, cannot be separated from the question of testamentary capacity; and conduct which might be held insufficient to influence unduly a person of normal strength might be sufficient to operate upon a failing mind'." In re Estate of Rogers, 242 Iowa 627, 635, 47 N.W.2d 818, 823, and citations. We have already held there was substantial evidence of lack of testamentary capacity.

The circumstances under which the will was drawn lend some support to the contention it was tailored for proponent's benefit. The testimony of Mr. Sagers indicates Doctor Scanlan did not propose to give anything to any relative. At Mr. Sagers' suggestion specific bequests were made to the nephews and nieces, except two who were apparently overlooked. There was no suggestion by Mr. Sagers that Doctor Scanlan give his heirs a substantial part of his estate. The bequests made were relatively small and obviously would tend to strengthen the will for proponent against assault by Doctor Scanlan's heirs.

It has been said each case of this nature must turn upon its own facts. In re Estate of Willer, 225 Iowa 606, 608, 281 N.W. 155. Although there may be here no single specific piece of evidence which would warrant a finding of undue influence there are various circumstances which point to that conclusion. Under all the facts shown we are constrained to hold the question of undue influence was for the jury.

IV. It may be observed that where cases of this nature are submitted on more than one issue, the sufficiency of the

64

proof of which may be questioned, some courts protect the record by requiring special findings by the jury.

█ One of the attorneys of record testified as a witness. Although it is not clear that he participated actively in the trial, he should have withdrawn his appearance as attorney. Cuvelier v. Town of Dumont, 221 Iowa 1016, 1020, 1021, 266 N.W. 517; Sewell v. Lainson, 244 Iowa 555, 569, 570, 57 N.W.2d 556, 564.—Affirmed.

GARFIELD, C. J., and BLISS, SMITH, MULRONEY, HAYS, THOMPSON, and LARSON, JJ., concur.