DANIEL F. WARD et al., appellees, v. RICHARD O. SEARS, individually and as executor of an instrument purporting to be a Last Will and Testament of Elizabeth M. Johnson, deceased, appellant.

No. 48970.

(Reported in 78 N.W.2d 545)

SEPTEMBER 18, 1956.

R. Buell Smith, Robert B. Dickey and Hollingsworth & Hollingsworth, by William Z. Hollingsworth, all of Keokuk, for appellant.

McManus & McManus and E. J. McManus, all of Keokuk, for appellees.

OLIVER, J.—April 2, 1953, Elizabeth M. Johnson signed a will giving "all * * * the property of which I may die possessed and especially Lot 5, in Block 104", etc. (her home in Keokuk) to defendant, Richard O. Sears, a neighbor to whom she was not related. Mr. Sears was nominated executor without bond. She died April 29. Her estate amounted to at least $25,000, and consisted of her home and $20,000 in bonds and money.

The will was admitted to probate. Later her heirs-at-law, related to her as cousins and second cousins, brought action to set aside the admission of the will to probate. The issues submitted to the jury were lack of testamentary capacity and undue influence. The verdict found the will invalid. From judgment against defendant thereon, he prosecutes this appeal.

Mrs. Johnson was aged about seventy or eighty years and had lived alone in her home since the death of her husband in 1950. Defendant, Sears, had done yard work, etc. for her and each day since Christmas 1952 had brought her a meal from his home. March 19, 1953, the sheriff served two notices upon her. One was an original notice of an action instituted against her by the chief of police. The petition stated she was living alone, had no close relatives, was not getting proper food, her house was in an unsanitary condition, she was not able to properly take care of her business affairs, and that a guardian should be

appointed to see that she had proper food and housing. The other notice was of a hearing upon "an application for the appointment of a temporary guardian to take care of your business affairs." The guardianship action was brought by the attorney who had represented Mrs. Johnson in probating her husband's estate which had been closed for some time.

From March 20 until her death Mrs. Johnson was confined to her bed. Mr. Sears was there much of the time. March 26 he brought the original notice of the guardianship action to the attorney's office stating, "Mrs. Johnson had no objection to the guardianship, just so she didn't have to go to the hospital * * *." Thereupon, the secretary for the attorney went to Mrs. Johnson's home and secured her signature to an instrument which stated, "defendant * * * enters her appearance and consents to the appointment of a permanent guardian and asks the court to appoint Richard O. Sears as such guardian." He was appointed and qualified March 26.

The attorney who instituted the guardianship action became attorney for the guardian. His connection with that matter had started some months previously when Mrs. Johnson's sister-in-law, Mrs. Erhardt, asked him to have Mrs. Johnson sent to the mental hospital at Mount Pleasant, stating she thought Mrs. Johnson was of unsound mind. He declined but called upon Mrs. Johnson and tried to get her to go to a hospital. She refused. Later he tried to get the welfare department to take action. It investigated, found she had sufficient assets to care for herself and declined to act. After that he prevailed upon the chief of police to sign the guardianship petition as plaintiff, telling him Mrs. Johnson was living alone and in filth and that her mind was not just right for her to take care of herself. Some time later Mr. Sears thanked the chief of police for signing the petition for a guardian and tucked a $10 bill into his pocket.

About April 2, Mr. Sears told the attorney Mrs. Johnson wanted him to draw a will for her. The attorney came to the house in the forenoon of April 2. Mr. Sears conducted him to Mrs. Johnson's bedroom. An employee of Mr. Sears remained in the bedroom. "I was just listening to the will. * * * Well, I have gone through trials before, and I think there should be

a witness, so I just stood there." The attorney asked Mrs. Johnson what she wanted to do in regard to the house. She answered by talking about an obstruction in the alley. He again asked her "what she wanted to do in regard to the house to which she replied that she wanted Dick (Sears) to have everything." The attorney left the room. Mr. Sears escorted him from the house. He returned to his office and prepared the will.

That afternoon the attorney's secretary came to the house with a witness and the will was signed in their presence and in the presence of Mr. Sears and Mrs. Lorenz, a practical nurse employed by him. The witnesses agree Mrs. Johnson did not then have the use of a hearing aid. Her nurse, Mrs. Lorenz, testified her eyeglasses were broken. The witnesses testified the attorney's secretary read the will to Mrs. Johnson after which Mrs. Johnson took the will out of her hand and read it herself and said that was the way she wanted it, and then she signed it. Because the word Elizabeth was signed on top of the word Johnson and the middle initial was omitted "it then had to be resigned."

Nearly all of the testimony above referred to was given by defendant and his witnesses. Two witnesses for defendant, the attorney and his secretary, expressed the opinion she knew what property she had, to whom she could leave it and to whom she intended to give it. The doctor who testified for defendant was not asked and did not give an opinion she was of sound mind. He testified she had high blood pressure, particularly some cerebral arterial changes which led to a stroke April 28, which caused her death April 29. She could not move her extremities, arms, legs and muscles, or control her urine. Her ailments would be progressive with time. You could have these ailments "and still know what you are doing; still be rational. She could have all these conditions and still know what property she has."

Mrs. Lorenz testified that the day after the will was signed she said to Mrs. Johnson, "You know you signed your house away." Mrs. Johnson answered, "Now I don't have to go to the hospital." Miss Boyer testified Mrs. Johnson told her, "I signed a paper that said I wouldn't have to go to the hospital."

The record does not show the source from which came her misinformation the will was such a "paper." The record does indicate she had an abiding fear she would be placed in a hospital.

No statement or conduct of Mrs. Johnson affirmatively shows she realized that the bulk of her estate was cash and bonds. Apparently she considered it was practically limited to her home. The single exception perhaps is the testimony of the attorney that, to his question what she wanted to do in regard to the house, she replied, "she wanted Dick to have everything." The will merely mentions all her property and especially Lot 5, etc., her home. To a suggestion by Miss Boyer that she should sell her property and go to a hospital, Mrs. Johnson replied, "Mr. Sears said he would help her. He was having the papers made out so she could sell it, and all she would have to do would be to sign it." Miss Boyer told her she ought not sign anything in the condition she was in. Miss Boyer testified also that Mrs. Johnson told her she had made a will leaving everything to her husband's folks. Mrs. Fry testified Mrs. Johnson told her, "Mr. Sears wants my home." Mrs. Fry told her such a gift must be in writing, to which Mrs. Johnson replied, "Well, that is what he says."

Decedent's long-time friends, her sister-in-law Virginia Erhardt, Mrs. Fry and Miss Boyer, a retired schoolteacher, observed decedent during frequent visits to her home, prior and subsequent to April 2. They testified that some time prior to 1953 Mrs. Johnson kept herself and her house clean and orderly; after that she seemed to fail quickly and did not want to do anything about it. She was able to get around the house until the last two months of her life but had lost control of her bowels and kidneys and walked as though her limbs were paralyzed. Her hair, body, clothing, bedding and house became indescribably filthy from human excretions, etc., and had an almost unbearable odor. She refused to change her clothing or bedding, and at times went around nude. "She was just rags and dirty and wet." She was very feeble, had lost her sense of smell, was unable to hear without a hearing aid and used eyeglasses which had belonged to her deceased husband and did not fit her eyes. The money from her pension and

social security payments was kept in a drawer and she appeared with a "whole lapful, so much money that it fell all around on the floor." Some of it was in the form of $50 bills. She did not cook groceries purchased for her. "They just laid there and spoiled." She did not like anybody. She did not like Mr. Sears very well. She thought he charged her too much for cutting the grass. She would pay no attention to visiting friends who were trying to converse with her, and would pace back and forth without noticing them. She offered to give her home to Mrs. Fry who did not consider it because of Mrs. Johnson's mental condition. She imagined people were in the house at various times. She did not care for company. "She didn't care to associate with the neighbors. She didn't care anything about anything." Toward the last (before the guardian was appointed) she had not enough mentality to tell what groceries she wanted.

During that period Miss Boyer selected the groceries and was careful to sign the grocery slips and leave them at the house. She testified Mrs. Johnson did not request an accounting of the grocery money and apparently did not realize this was an accounting, but, "I didn't think she knew what she was doing, and I thought it might make trouble for me." Each of these three witnesses was asked substantially: "Q. From your acquaintance with Mrs. Johnson, and your observation of her over the period of time that you knew her in the period of time that you have related to the jury here, during the months of March and April of 1953, do you have an opinion as to whether or not she was of sound mind at that time?" Each answered in the affirmative and was then asked for that opinion. They answered, "No, I don't think she had a sound mind." "I don't think she was in her own mind and she got worse all the time. I don't think she knew what she said or what she did. She wasn't in sound mind for a long while." "She wasn't of sound mind."

I. Defendant assigns error to the overruling of his objections to the questions calling for the opinion of each of these lay witnesses. He contends these witnesses did not relate sufficient circumstances or incidents to support such an opinion. The governing rule is well settled.

Ipsen v. Ruess, 239 Iowa 1376, 1387, 35 N.W.2d 82, 90, states:

"Before nonexperts may give their opinion of mental unsoundness they must first testify to facts reasonably tending to support the opinion. [Citations] Whether sufficient facts have been detailed is primarily a question for the court in the exercise of a sound legal discretion. [Citations] We will not interfere unless it clearly appears such discretion has not been properly exercised. [Citations]

"It does not appear there was an abuse of discretion in permitting the witnesses * * * to express an opinion testator was of unsound mind. The facts detailed by them, especially by Margaret Angerer, are inconclusive and may not clearly point to mental incapacity. But they are somewhat inconsistent with mental soundness and furnish some support for the opinion given. This is enough to render the opinion admissible. Its value is measured by the strength of the facts on which it is based."

Among other decisions subscribing to this rule are: In re Estate of Van Dyke, 245 Iowa 942, 949, 65 N.W.2d 63; Olsen v. Corporation of New Melleray, 245 Iowa 407, 425, 426, 60 N.W.2d 832, 843; In re Estate of Guinn, 242 Iowa 542, 546, 47 N.W.2d 243, 245; In re Estate of Maier, 236 Iowa 960, 966, 967, 20 N.W.2d 425. Grismore v. Consolidated Products Co., 232 Iowa 328, 342, 5 N.W.2d 646, 654, points out that courts should be, and are, very loath to interfere with such discretion unless it has been manifestly abused to the prejudice of the complaining party.

In a few decisions the factual basis for such rulings is set out at length. One of these is In re Estate of Workman, 174 Iowa 222, 231, 232, 233, 156 N.W. 438, 442, in which the foundation for the opinion was less than that furnished by the testimony of any one of these three witnesses and the court held the sustaining of the objection was error. The Workman case states also: "In a case like this, where the disease is slowly progressive, it is not necessary that the observations upon which the opinion of insanity was based were had at the time the will was executed or immediately before."

In re Estate of Rogers, 242 Iowa 627, 631, 47 N.W.2d 818, contains a more complete statement of this rule.

That the testimony of each of the three witnesses was somewhat inconsistent with Mrs. Johnson's mental soundness does not appear open to serious doubt. We hold the overruling of the objections was not an abuse of the discretion lodged in the trial court.

II. Dr. Benjamin D. Van Werden who made two professional calls upon Mrs. Johnson in the last half of March 1953 was asked his opinion whether or not she was then of sound mind. When defendant objected the court questioned the doctor who testified he had a general medical education, including mental diseases and neurology, and had considerable experience with mental cases. The court: "He may answer. He is an expert witness. He is qualified. A. It is my opinion * * * the woman was unsound."

Our decisions hold a regular practicing physician is qualified to give an expert opinion of the mental condition of a patient under his care. Miller v. Miller, 237 Iowa 978, 987, 23 N.W.2d 760, 765; In re Estate of Van Dyke, 245 Iowa 942, 65 N.W.2d 63, and citations; Monahan v. Roderick, 183 Iowa 1, 13, 166 N.W. 725.

It is clear the trial court did not err in overruling the objection.

III. Doctor Van Werden testified also that when he first called on Mrs. Johnson the house smelled like a urinal and she was lying on the couch upon which she had wet, right in her clothes, and she was very malnourished and very poorly kept, unclean and in filth. She asked who he was and he told her he was a doctor and the police had asked him to see her. He said, "I think you ought to go to the hospital." She said, "I'm not going to the hospital."

During his second call she complained to him about somebody changing the lock on her door. She objected to being examined. "She wouldn't voluntarily let me take her blood pressure, or listen to her heart or anything else. * * * She didn't care for me." She knew who the doctor was and when he asked her if she had pain, "here"? she answered, "No." "Does it

hurt you anywhere? No." The doctor testified there was no rational foundation for her dislike of him and it was not an intelligent or normal reaction.

In expressing his opinion Mrs. Johnson was of unsound mind, he testified:

"A. It is my opinion that any person in her condition, that there is a definite mental change—I mean, here is a woman that has kept herself clean; kept her home clean, and all of a sudden, she becomes unclean. She has no interest in her home. She hasn't enough interest to get up and get herself something to eat. Of course, there is the physical side of that too, in this respect; that she wasn't able to do a great deal for herself, but when she had means that she could have done something for herself and didn't do it, it is a deviation in the mind, and the woman was unsound."

Defendant contends this testimony should have been excluded because it was based primarily on testatrix' physical appearance and not on her mental condition. Upon this point defendant relies upon In re Will of Hook, 189 Iowa 287, 290, 178 N.W. 357, 358, where the opinion of the doctors was based "upon the convenient theory that, inasmuch as he was bodily sick, he could not have been mentally sound," etc.

Doctor Van Werden's reasoning is to the contrary. His answer states "there is the physical side * * * that she wasn't able to do a great deal for herself, *but when she had means * * * and didn't do it, it is a deviation in the mind.*" (Italics supplied.)

Hence, the holding in the Hook case is not applicable to the opinion testimony of Doctor Van Werden. His opinion testimony was admissible and the jury properly could have given it substantial weight. It is reasonable to assume Doctor Van Werden took into consideration, also, the abnormal hostility exhibited by Mrs. Johnson toward him on his second visit and the refusal then to voluntarily permit him to examine her, which he testified was not an intelligent or normal reaction.

IV. Defendant contends the evidence was insufficient to justify submission to the jury of the issue of lack of testamentary

capacity. The references already made to much evidence upon that issue will not be repeated. Mrs. Lorenz, the practical nurse employed late in March by the guardian to care for Mrs. Johnson, thus described the condition in which she found her: "* * * she must have fell to the floor, and Dick [Sears] and I * * * picked her up. * * * Well, she was kind of confused because she was by herself, you know. * * * Well, she looked up at us like she was awfully grateful that someone had come. * * * Oh, her hair was awfully matted, so we got a bottle of alcohol and cleaned it all out, and what I couldn't clean out, I got a scissors and cut off. Her hair was in terrible condition. Her clothing was all wet where she had urinated all over everything."

Another circumstance entitled to consideration is that Mrs. Johnson was under guardianship when the will was executed. Reeves v. Hunter, 185 Iowa 958, 961, 171 N.W. 567, 569, states: "It is settled in this state also that, though a person be under guardianship, he may yet be found competent to make a will. In such case, however, the fact of guardianship is presumptive proof of incompetency to make a will, and the burden is upon the proponent to overcome such presumption."

There are similar statements in Olson v. Olson, 242 Iowa 192, 212, 46 N.W.2d 1, 12, 40 A.L.R. 2d 1, and Spiers v. Hendershott, 142 Iowa 446, 457, 120 N.W. 1058, 1062. This presumption and its effect are considered in Brogan v. Lynch, 204 Iowa 260, 262, 263, 214 N.W. 514, and In re Estate of Willer, 225 Iowa 606, 281 N.W. 155.

We are satisfied the evidence of lack of testamentary capacity was sufficient to make that issue one of fact for the jury. In re Estate of Rogers, 242 Iowa 627, 47 N.W.2d 818; In re Estate of Ring, 237 Iowa 953, 22 N.W.2d 777.

V. Defendant questions the sufficiency of the evidence of undue influence to permit submission to the jury of that issue. Reference to most of such evidence has been made already. Even before he became her guardian Mr. Sears had considerable control over Mrs. Johnson. When Mrs. Fry suggested Mrs. Johnson should be in the hospital, Mr. Sears said, "Well, why spend all that money? I'm taking good care of her." She remained at home. Shortly after Mr. Sears was appointed her

guardian Mrs. Johnson suffered a sudden illness. Mrs. Lorenz, a witness friendly to Mr. Sears, admitted she said to him, "We ought to have a doctor," and he replied, " 'When I get the will signed.' "

The record shows Mr. Sears was active in connection with the preparation and execution of the will. It was he who first contacted the attorney who drew it and who was then attorney for Mr. Sears as guardian. An employee of Mr. Sears was present when the attorney came to her bedside concerning the will. Mr. Sears was present when it was signed. No one talked with Mrs. Johnson alone about this will. She had no independent legal advice. There was evidence she had a previous will which gave her estate to her husband's family. She had blood relatives, also.

Nor was Mr. Sears the only person who helped her during her decline. Mrs. Fry and Mrs. Erhardt called upon her frequently and the latter occasionally cleaned her house and washed her clothes. Miss Boyer helped her every second day and apparently was very close to her. Under the circumstances, the new will which gave her estate to Mr. Sears, to the exclusion of all others, could have been found unfair and unnatural.

Graham v. Courtright, 180 Iowa 394, 407, 161 N.W. 774, 778, states the existence of a confidential relationship such as guardian and ward affords peculiar opportunities for influencing the mind, and where the dominant party is active in the preparation or execution of the will and is made a beneficiary thereunder a suspicion arises that the benefaction may have resulted from the exertion of undue influence over the testator rather than his free volition.

The text in 57 Am. Jur., Wills, section 389, states: "It is generally accepted that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator. Such consequence follows a confidential relationship between the testator and the beneficiary only where the beneficiary has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstance, such as mental infirmity of the testator or unfairness in the will."

Olsen v. Corporation of New Melleray, 245 Iowa 407, 60 N.W.2d 832, points out that such a will is not looked upon with favor and the court should cautiously and carefully examine into the circumstances surrounding its execution. Some suspicious circumstances would be an unnatural and unreasonable bequest, a large legacy compared to the total value of the estate, testator's weak mental condition at or near the time of the execution of the will.

There is a good discussion of the rule, with citations, in 30 Iowa Law Review 321, et seq.

In re Estate of Rogers, 242 Iowa 627, 635, 636, 47 N.W.2d 818, 823, states evidence of undue influence need not be direct and that executrix' mental strength or lack thereof is an important element. It quotes from Brogan v. Lynch, 204 Iowa 260, 264, 214 N.W. 514, 516, "The question of undue influence, in a case of this kind, cannot be separated from the question of testamentary capacity; and conduct which might be held insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind [citations]."

In the case at bar, a consideration of the entire record results in the conclusion the evidence of undue influence was sufficient to require submission to the jury of that issue.

VI. Although our conclusions, above set out, are determinative of the appeal, it may be well to consider one other proposition. Relying upon the quoted statement from Brogan v. Lynch, supra, approved in later decisions, appellees argue that where there is some evidence of mental weakness coupled with a jury question of undue influence, the question of testamentary capacity should be submitted. This is not correct. It is error to submit to the jury any issue not supported by substantial evidence. However, there may be error which is without prejudice and, hence, is not reversible.

There are decisions of this court holding that where *special verdicts or findings* (see R. C. P. 205 and 206) show a verdict is based upon an issue properly submitted to the jury, the erroneous submission of other issues does not necessarily constitute *reversible* error. Liddle v. Salter, 180 Iowa 840, 857, 858, 163 N.W. 447, 454, states:

"In view of the fact of there having been affirmative answers to two special interrogatories, finding testatrix to have been of unsound mind, as well as that the will was the product of undue influence, we are of the opinion that there was no prejudice. This is put on the ground, however, that there was sufficient evidence to carry both issues to the jury, as there was. [Citations] Though, where the evidence has been held insufficient to support one of the special affirmative findings of undue influence and mental incapacity, some of the above decisions seem to regard the submission of such issue as *without prejudice*." (Italics supplied.)

In the case at bar there were no special findings. However, we have already held there was sufficient evidence to carry each of the two issues to the jury. Hence, the verdict could have been based properly upon either or both issues.—Affirmed.

THOMPSON, C.J., and BLISS, GARFIELD, HAYS, LARSON, and SMITH, JJ., concur.