# IN THE COURT OF APPEALS OF IOWA

No. 18-1405
Filed September 25, 2019

**IN THE MATTER OF THE ESTATE OF FREEMAN ADAMS, Deceased.**

**THE ESTATE OF DOROTHY FISHER, by and through her executor, JOHN H. FISHER,**
    Appellant.
_____

Appeal from the Iowa District Court for Fayette County, Margaret L. Lingreen, Judge.

The estate of Dorothy Ruth Fisher appeals the ruling of the probate court ultimately finding her brother's will was valid. **AFFIRMED.**

Nathan J. Schroeder and David J. Dutton of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Patrick B. Dillon of Dillon Law, P.C., Sumner, for appellees Scott Adams and Nathan Adams.

John W. Hofmeyer III of Hofmeyer & Hanson, P.C., Fayette, for appellee Edward Brannon.

Heard by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

The estate[1] of Dorothy Ruth Fisher appeals the probate court's (1) dismissal of her petition in probate seeking to open an intestate estate for her brother Freeman Adams, (2) sustaining the petition of a beneficiary of Freeman's 2011 will to probate Freeman's will, and (3) sustaining the motion for a directed verdict on a claim of undue influence. Upon our review, we affirm the court's ruling in all respects.



### I. Background Facts and Proceedings.

Freeman Adams passed away in December 2016. Dorothy Ruth Fisher (née Adams)—Freeman's sister and former conservator—petitioned in probate

---

[1] Dorothy Ruth Fisher passed away and her estate was substituted as a party in her place. We refer to appellant-contestant as Dorothy Ruth.

seeking to open an intestate estate for Freeman.[2]  Dorothy Ruth acknowledged in her petition that she had found in Freeman's possessions a 2011 document declaring to be Freeman's "Last Will and Testament."  Dorothy Ruth asserted the document was "invalid due to lack of testamentary capacity," or "the product of undue influence or both . . . and should not be admitted to probate."  Dorothy Ruth requested she be appointed administrator of the estate.

The beneficiaries of Freeman's will were notified Dorothy Ruth had filed the probate petition.  Two beneficiaries, Scott Adams and his son Nathan Adams, objected to Dorothy Ruth's petition, arguing Freeman's will was valid.  They asked the court to deny Dorothy Ruth's petition for intestate administration of the estate and requested the will be admitted to probate and Scott be appointed executor.  Scott also petitioned for probate of will and appointment of executor, again requesting he be appointed executor of the estate.  At some point, beneficiary Edward Brannon joined the action as an interested party.  Dorothy Ruth objected to Scott and Nathan's request.

The dueling petitions over the administration of the estate came on for a bench trial in May 2018.  After the cases in chief, Brannon moved for a directed verdict as to any claim of undue influence on his part.

The probate court made these findings of fact essentially not in dispute:

### A.  *Freeman's Life and History.*

1. Freeman Adams was born June 16, 1926, to John and Dorothy Adams.  Freeman had two siblings, Howard and Dorothy Ruth . . . .

---

[2] Because many people involved here share the surname Adams, we will use their first names for clarity.

Freeman grew up on the family farm in Waucoma, Iowa. Freeman was drafted into the army and served in Korea. He was discharged in 1952. Upon discharge, Freeman returned to live with his parents.

2. Following his return from the army, Freeman began showing signs of mental illness. He was admitted to the Mental Health Institute [(MHI)] in Independence, Iowa on or about October 15, 1956. He stayed at MHI for approximately one year.

On April 28, 1958, Freeman was readmitted to MHI. He was later transferred to the Veterans Administration [(VA)] Hospital in Knoxville, Iowa. There, Freeman was diagnosed with paranoid schizophrenia. Records indicate Freeman had delusions of persecution; that food/air were being poisoned; that he had syphilis; that he would give people syphilis if he shook their hand. Freeman was treated with Mellaril, an antipsychotic, and Stelazine, an antianxiety and antipsychotic drug.

At various times, Freeman was hospitalized at the VA Hospital in Knoxville. When released from the hospital, he resided with his parents in Waucoma. Following the passing of Freeman's father, Freeman continued to live with his mother at the family homestead. He and his mother later moved to a house in Waucoma.

3. In 1960, Freeman's mother . . . was appointed his guardian. [She] served as Freeman's guardian from approximately 1960 to 1984. She managed all of Freeman's financial affairs, including applying for disability and VA benefits, paying Freeman's bills and providing for his daily needs, including providing a place to live. Freeman did receive a monthly allowance for groceries and other expenses. However, all other financial affairs were managed by the guardian. Although released from the Knoxville VA Hospital in 1966, Freeman continued to suffer from mental disability. He was diagnosed as suffering from schizophrenia with severe social and industrial impairment. Freeman continued to take antipsychotic medications for the rest of his life.

4. The evidence indicates Freeman had certain idiosyncrasies, including refusing to flush the toilet; picking up discarded cigarettes to smoke; refusing to cut his fingernails, regularly bathe or have a haircut more than twice a year; refusing to answer the telephone at times; refusing to use certain appliances; saving plastic twisters; irregular sleep habits; sleeping on a cot, rather than a bed; and keeping the house dimly lit.

5. Freeman was never employed. His income came from farm rent, VA pension, disability insurance, annuities and other investments set up by his mother, along with Freeman's sister Dorothy Ruth . . . .

6. Freeman's sister . . . took over as conservator in 1984, due to [their mother's] failing health. [Their mother] died in 1991. Dorothy

Ruth . . . served as conservator from 1984 to the date of Freeman's death in 2016.

Following the death of [their mother], Freeman lived in [his mother's house] in Waucoma. Although Freeman was able to drive his car and purchase groceries, the evidence indicates he did not take care of all of his daily personal needs. For instance, his sister, Dorothy Ruth, would do his laundry, prepare meals, clean the house, purchase clothes, and require him to bathe.

Dorothy Ruth managed Freeman's financial affairs. She was responsible for paying for home repairs, paying utilities, managing checking and savings accounts, paying individuals who did work at Freeman's residence, paying doctor bills, obtaining and paying car insurance, paying car and property insurance, purchasing clothes for Freeman, managing Freeman's investments and annuities, arranging for food and for medical care, and preparation of his tax returns.

[Melanie Mae Fisher, Dorothy Ruth's daughter, served with her mother as a co-conservator of Freeman.]

7. In 2008, Dorothy Ruth purchased a new home for Freeman in Waucoma, Iowa. This is where Freeman lived until his death. Freeman died December 17, 2016.

8. Freeman owned an undivided one-half interest in 69 acres of farmland located in Sections 7 and 18 of Eden Township. Freeman acquired this land with his brother Howard Adams. In 1981, Dorothy Adams transferred a 2/9 interest in the family farm to Freeman. The farm consisted of 150 acres and was located in Sections 9 and 10 of Eden Township. With [his mother's] death, Freeman inherited an additional 5/9 share in the family farm. This brought his total interest in the family farm to 7/9. Freeman also inherited [his mother's house].

9. . . . In 1986, Scott [Adams] signed a rental agreement with [Freeman and Freeman's mother] to lease farmland. . . . Nathan [Adams] farms with his father [Scott] and has been involved in renting and farming the land Freeman has an ownership interest in. The evidence in the record indicates Nathan . . . had frequent contact with Freeman at the Riverside Bar & Grill in Waucoma, Iowa, as Freeman was a frequent customer there. Nathan . . . and Freeman frequently conversed; those discussions included the rented farmland. Nathan testified he approached Freeman twice about purchasing Freeman's land. On one occasion, Freeman chuckled; Freeman never expressed an interest in selling the land. Nathan testified that Freeman was invited to Nathan's graduation and wedding.

10. In January 2011, Freeman fell and broke his arm. He was treated at [a hospital] and then transferred to the New Hampton Nursing and Rehabilitation Center [(Nursing Home)] for therapy. Freeman remained at the . . . nursing home for over three months.

Freeman was admitted to the [Nursing Home] on January 25, 2011. In a mental status questionnaire . . . which tested cognitive ability, he scored 7 out of a possible 11 points. This would place him in the range of 5 to 8 points, which, according to the scale, indicates moderately advanced impairment. However, in an examination administered January 31, 2011, regarding "cognitive patterns," . . . Freeman scored 13 out of 15 possible points, a successful score. In a Level II Mental Illness/Mental Retardation Screening dated February 24, 2011, Freeman's intelligence was noted as "average," his long-term memory was described as "intact," and he had mild issues concerning short-term memory. No hallucinations or delusions were found. It was noted he had chronic mental illness, but it was controlled with meds. . . . Nursing notes of March 16, 2011, appear to be the first indication of confusion with hallucination. The confusion appears to continue to March 18, 2011. On March 19, 2011, although confused about his stay in the nursing home, the notes reflect Freeman was accurate as to names, current events, and residents in Waucoma. Confusion was again noted March 21, 2011; a new medication, Seroquel, was administered on or about March 22, 2011. There is no indication of hallucinations or problematic confusion in the days immediately preceding Freeman's discharge from the nursing home on March 31, 2011. As noted by [a nurse practitioner] at the [Nursing Home], Freeman's confusion, which included hallucinations, existed only four to five days, while Freeman was at the nursing home.

After his release from the nursing home, . . . Dorothy Ruth . . . initially spent nights at Freeman's home in Waucoma. If [Dorothy Ruth] was not staying with Freeman, [his brother] Howard Adams's wife, Evelyn, would stop in and check on Freeman.

### B. Freeman's Will.

11. On September 22, 2011, Freeman took a handwritten note to Attorney Kevin Kennedy of Kennedy & Kennedy in New Hampton, Iowa. Freeman requested the preparation of a will. In his handwritten note, Freeman wrote he wanted to leave the land in the "Adams" name so was choosing Nathan Adams as the owner after Freeman passed. With regard to the 60-plus-acre farm, Freeman wrote he wanted to give 48% to Brannon and 2% to Howard Adams. Freeman also wrote that with regard to his car, such as it was, it might be taken to Jayme Kleve. Upon questioning by Kevin Kennedy, Kennedy learned where the rest of Freeman's property should go [to] the individual to be named as executor. Freeman did not specifically address the two houses in Waucoma he owned. Freeman's handwritten note also does not convey he owned only a partial interest in the 60-plus-acre farm.

[Brannon] . . . and Freeman would visit at the Riverside Bar & Grill. Jayme Kleve worked at a convenience store in Waucoma and bartended at Riverside Bar & Grill. Jayme's father testified that Freeman would give Jayme small gifts on her birthday and at Christmas.

To prepare the will, Kennedy needed to determine where the farmlands were located. Freeman identified the townships where the land was located and located the land in a plat book of Kennedy's. Kennedy testified he had no indication, while meeting Freeman, that Freeman was not competent. Although Freeman's handwritten note provided to Kennedy did not include a residuary clause nor identify an executor, upon questioning by Kennedy, Freeman identified Scott Adams as the individual he wished to nominate as executor and identified his sister, [Dorothy Ruth], as his residuary beneficiary. There is no indication Freeman questioned or denied the need for a residuary beneficiary.

A will was, in fact, prepared for Freeman . . . on September 22, 2011, which [Freeman] signed in Kennedy's office. At trial, Kevin Kennedy indicated [Freeman] would have been present at the law office for approximately 60 minutes. While with Freeman, Kennedy neither heard any statement of Freeman's nor observed any behavior by Freeman which caused him to question Freeman's competency.

12. In addition to the 2011 will, Freeman . . . had a will executed in October 2000. This will was prepared by Michael Kennedy of the Kennedy & Kennedy law office in New Hampton, Iowa. Although this will contained additional, specific bequests beyond those made in the 2011 will, some provisions of the two wills are similar. For instance, Freeman made the same disposition of his interest in the 60-plus-acre farm, leaving 48% to [Brannon] and the remaining 2% to Howard Adams. In his 2000 will, Freeman also made a specific bequest of his vehicle, although he left it to a different individual. As in the 2011 will, Dorothy Ruth . . . was also the residuary beneficiary named in the 2000 will.

### C. Trial Testimony Regarding Freeman's Behavior and Cognition.

15. People familiar with Freeman, through contact with him at the Riverside Bar & Grill or at the local bank, testified as to interactions they or others had with Freeman. No one expressed concern regarding his mental health. They never witnessed evidence of hallucinations. [The] owner and operator of the Riverside Bar . . . noted [Freeman] did not care to shake hands with people and testified he witnessed Freeman take partially-used cigarettes from an ashtray and smoke them. [The owner] was aware of other idiosyncrasies, but these did not cause him concern as to Freeman's mental health.

16. Doctor Herbert Notch, a clinical psychologist, reviewed Freeman's medical records. Notch noted schizophrenia is marked by hallucinations and delusions. He noted that initially people suffering schizophrenia cannot function in society; however, with proper medication, they can do so. If an individual becomes noncompliant with their medication plan, they experience delusions and hallucinations, which those around them witness. Notch believes that, if Freeman was suffering from schizophrenia, he would have experienced hallucinations and delusions. Had that occurred during the appointment at Kennedy's law office and execution of the will, those present would have had occasion to question Freeman's competency. From the records and materials reviewed by Notch, he found [Freeman] competent at the time the will was executed.

17. At the time Freeman executed the 2011 will, the report filed in his conservatorship indicated not only an interest in two parcels of farmland but ownership of two homes in Waucoma, Iowa; a car; an annuity account; checking and savings accounts; US savings bonds; CDs; and a number of personal property items. The report and inventory filed in Freeman's estate reflect the beneficiary of the savings bonds and several CDs had already been established by Freeman, prior to his death. [Dorothy Ruth] Fisher was named as a joint owner of the savings bonds. [Dorothy Ruth Fisher], as well as her daughter Melanie Fisher, were designated as payees of certificates of deposit, on Freeman's death. In view of the many services and assistance provided by these individuals to Freeman during his life, it is not surprising arrangements were made for their receipt of these assets on Freeman's death.

18. At trial, Melanie Fisher introduced calendars found when Freeman moved covering calendar years 1986 through 2006. In a number of entries, Freeman made reference to being "doped." The Court, however, finds any interpretation of the calendars is speculation. Furthermore, the calendars predate the 2011 will by at least five years.

19. The proponents of the 2011 will were unaware of the contents of the will, until learning of Dorothy Fisher's intent to seek intestate administration of Freeman's estate.

### D. Court's Ruling.

After hearing the evidence and finding these facts, the court determined Freeman had the mental ability to make his will in September 2011. The court noted the purposeful and appropriate actions Freeman undertook to have his will prepared, as well as witnesses' accounts of having no concerns about Freeman's

overall mental health, including the testimony of his attorney who drafted his will. The court found Freeman's schizophrenia was managed by medication; there was no evidence when he executed the will that he was suffering from any delusions or hallucinations. More specifically, the court found Freeman's idiosyncrasies did not make him incompetent to execute a will. As to undue influence, the court determined there was no evidence that anyone unduly influenced Freeman in making his will or in designating persons as his beneficiaries.

The probate court dismissed Dorothy Ruth's petition, sustained Brannon's directed verdict as to the claim of undue influence, and sustained Scott's petition for probate of Freeman's will.

Dorothy Ruth appeals the court's ruling. Our review is for correction of errors at law. *See Pearson v. Ossian*, 420 N.W.2d 493, 495 (Iowa Ct. App. 1988); *see also* Iowa Code §§ 633.33 (2017) ("Actions to set aside or contest wills, for the involuntary appointment of guardians and conservators, and for the establishment of contested claims shall be triable in probate as law actions . . . ."), .311 ("An action objecting to the probate of a proffered will, or to set aside a will, is triable in the probate court as an action at law . . . ."); Iowa R. App. P. 6.907. But questions of the admission of expert testimony during a bench trial are reviewed for an abuse of discretion. *See Metro. Prop. & Cas. Ins. v. Auto-Owners Mut. Ins.*, 924 N.W.2d 833, 839 (Iowa, 2019); *Hagenow v. Schmidt*, 842 N.W.2d 661, 671-672 (Iowa 2014), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707-08 (Iowa 2016).

## II. Discussion.

On appeal, Dorothy Ruth asserts the court erred in several respects. She maintains there is a presumption that Freeman lacked the testamentary capacity to execute a will because he "was under a permanent guardianship." On that basis, she argues the burden should have shifted to require the proponents of the will to prove Freeman had the testamentary capacity to execute the will. Alternatively, she contends the court erred in concluding Freeman had the testamentary capacity to execute his 2011 will and in concluding Freeman's will did not result from undue influence. She also claims the court committed reversible error "in allowing a witness to offer expert testimony regarding capacity to execute a will" and the admission was prejudicial, requiring reversal and remand for a new trial.

### A. Testamentary Capacity Presumption.

"The burden of proof is on contestants in a will contest to establish testator at the exact time of the making of the will lacked one or more of the essentials of testamentary capacity." *In re Estate of Gruis*, 207 N.W.2d 571, 573 (Iowa 1973); *see also Pearson*, 420 N.W.2d at 495. Dorothy Ruth argues that because Freeman was under a "permanent guardianship," he was presumptively incompetent to execute a will and the burden of proof should have shifted to the proponents of the will to overcome that presumption. She cites *Ward v. Sears*, wherein the Iowa Supreme Court stated:

> It is settled in this state also that, though a person be under guardianship, he may yet be found competent to make a will. In such case, however, the fact of guardianship is presumptive proof of incompetency to make a will, and the burden is upon the proponent to overcome such presumption.

78 N.W.2d 545, 550 (Iowa 1956) (*quoting Reeves v. Hunter*, 171 N.W. 567, 569 (Iowa 1919)).

As Brannon points out, the legal landscape has changed since *Ward* was handed down. In 1963, the legislature enacted Iowa Code section 633.636, which currently provides: "The appointment of a guardian or conservator shall not constitute an adjudication that the ward is of unsound mind." *See* 1963 Iowa Acts ch. 326, § 636; *see also* Iowa Code § 633.636 (2017). He argues section 663.636 rendered *Ward* invalid.

Ultimately, even assuming without deciding the probate court should have placed the burden of proof upon the proponents of Freeman's will—here Brannon, Scott, and Nathan—to show that Freeman had testamentary capacity to execute his will when it was executed, for the reasons that follow, we find the record evidence establishes the will's proponents met that burden.

**B. *Freeman's Testamentary Capacity to Execute 2011 Will*.**

For Freeman to have had general testamentary capacity when he executed the 2011 will, Freeman "must have known and understood: (1) The nature of the instrument being executed; (2) The nature and extent of his property; (3) The natural objects of his bounty; and, (4) The disposition he desired to make under his last will and testament." *In re Estate of Lachmich*, 541 N.W.2d 543, 545 (Iowa Ct. App. 1995); *see also In re of Estate of Dankbar*, 430 N.W.2d 124, 127 (Iowa 1988). "All of the above four elements must exist coextensively at the time the will is executed." *In re Estate of Henrich*, 389 N.W.2d 78, 81 (Iowa Ct. App. 1986). Stated another way, "[t]he proof of a mental deficiency must be applicable to the time of making the will." *Id.* Even so, "evidence of the condition of the mind of the

testator at other times may be received if there is a reasonable basis for the conclusion that it throws some light on his mental competence at the time the will was made." *Id.* (quoting *Gruis*, 207 N.W.2d at 573). Generally, we do not disturb the fact-finder's determination that contestants failed in their proof. *See In re Estate of Hetrick*, No. 11-1702, 2012 WL 3860749, at *3 (Iowa Ct. App. Sept. 6, 2012).

One illustration set forth in the Restatement (Second) of Property, Donative Transfers section 34.5 (1992) is particularly instructive:

> O's daughter D contests the will of her father on the ground of mental incompetency. O had suffered from schizophrenia and had been in and out of mental hospitals for 20 years. The will is valid, however, because O was on medication when executing the will and was experiencing a lucid interval.

Dorothy Ruth argues the above elements were not met because

> (1) Freeman never handled his own finances or other activities of daily living; (2) Freeman did not know the kind and extent of his property; (3) Freeman's mental and physical condition, including having documented delusions and hallucinations while being administered antipsychotic medications six months before the will was signed; (4) Freeman showed no signs of comprehending the effect of his distribution; and (5) the distribution was wholly unnatural.

Upon our review of the record, we find no error by the court.

Although Freeman was an older gentleman diagnosed with significant mental-health issues, the evidence presented supports the court's finding that Freeman was legally competent when he executed his will in 2011. Freeman made a list of what he wanted to have done in his will, made an appointment with an attorney, and met with the attorney to have his will drafted. Although Freeman's list contained misspellings and did not include every item of his property, this is part of the process for which he was meeting with an attorney. Freeman's attorney

testified he talked to Freeman about the will and would not have continued if he did not think he was competent to do so. After the will was drafted, the attorneys and witnesses affirmed Freeman was of sound mind when he executed the will. These witnesses stood to gain nothing from Freeman. By all accounts, Freeman's 2011 will was much like and consistent with an earlier will he executed in 2000.

There can be no question Freeman struggled with his mental-health issues over the years and exhibited some unusual behaviors. This did not render him incompetent to execute a will. *See generally Drosos v. Drosos*, 103 N.W.2d 167, 172 (Iowa 1960) ("No mere impairment of his mental or physical powers, so long as he retains mind and comprehension sufficient to meet the tests . . . invalidates his will."). He was treating his illness with medication and able to live an active life, and he was institutionalized earlier in his life when he could not care for himself. Though Dorothy Ruth and her daughter helped Freeman immensely during his life, he was still greatly independent and lived alone. In his later days, he resided in a nursing home when his physical injuries rendered him unable to care for himself, but he was still able to return to his home after his nursing home stays in 2011 and 2013. Ultimately, Freeman's property was Freeman's to dispose of as he saw fit. He was generous with his family; that some got more than others was his choice.

> The power of a testator to dispose of his or her property by will includes the right to make an unnatural or unreasonable disposition of such property. A testator may make an unreasonable or unjust will, and a court will not set aside a will merely because it considers the distribution made of an estate to be unfair or unreasonable.

79 Am. Jur. 2d *Wills* § 53 (Westlaw 2019) (footnotes omitted).

In finding Freeman was competent to execute the contested will, the probate court determined:

> In the instant case, the court finds [Freeman] had the mental ability to make a will on September 22, 2011. He arranged for an appointment with an attorney, for the specific purpose of executing a will. He took his own proposed draft of a will with him to the appointment. Although Freeman chose to make only a few specific bequests, he identified who he wished to receive the balance of his property through a residuary clause. Freeman was able to identify the location of the real estate parcels he included in his will and recognized he did not have [absolute] ownership of the 60-plus-acre farm. Freeman did not bequeath his property to mere acquaintances. He bequeathed the farm real estate in Sections 9 and 10 to [Nathan], his tenant and a relative, who had expressed an interest in continuing to farm the land. The 60-plus-acre farm in Sections 7 and 18 he bequeathed a portion to his brother, [Howard], and the remainder to [Brannon]. He bequeathed a car to . . . a young woman that he had previously gifted at Christmas and birthdays. He directed the residue of his estate pass to his sister [Dorothy Ruth]. As noted, other provisions had already been made for [Dorothy Ruth] and her daughter [Melanie] with certain CDs being payable on death to the women and savings bonds identifying [Dorothy Ruth] as co-owner. The court finds Freeman knew the kind and extent of his property and was able to identify or remember those persons he would naturally give his property to. Again, as noted, Freeman took his own rough draft of will provisions to his appointment with [his attorney]. He clearly knew how he wanted to distribute his property.
>
> Although having been diagnosed with schizophrenia, the record indicates Freeman generally functioned without incident. Dr. Notch testified that, if Freeman had been suffering from schizophrenia at the time he traveled to [his attorney's] office for the drafting of his will, Freeman would have experienced hallucinations and delusions, which would have been apparent to [his attorney] and [his attorney's] staff. The only evidence of hallucinations in 2011 come from the records of the [Nursing Home], when Freeman was residing there from late January through March 2011. Throughout his time there, the documented hallucinations occurred a total of four to five days and had ceased prior to Freeman's discharge.
>
> The court finds credible and relevant the testimony of various individuals acquainted with Freeman, from Waucoma. These witnesses did not express concern regarding Freeman's mental health; they did not witness evidence of hallucinations or delusions. Although Freeman apparently had idiosyncrasies, idiosyncrasies do not make the individual incompetent to execute a will.

We have no disagreement since the evidence fully supports the court's conclusion that Freeman was legally competent when he executed his will in 2011. We therefore find no error.

### C. Expert Testimony Regarding Capacity to Execute Will.

We next turn to Dorothy Ruth's argument concerning Dr. Herbert Notch's testimony. Dr. Notch was called by Scott and Nathan Adams as an expert in clinical psychology. Dr. Notch reviewed Freeman's medical records from 1952 to 1977 and provided his opinions about Freeman's schizophrenia diagnosis and treatment. His written report opined:

> Based upon my review of the records sent to me, it appears that Freeman Adams was judged to be competent at hospital discharge by the attending psychiatrist. He was also seen as competent in all of the discovery testimony I reviewed. Once again, in my opinion the fact that Freeman was under permanent guardianship does not preclude competency. While some matters of judgment may be open to conjecture, Freeman was, it appears, oriented and alert, responsive to time, place and person.

At trial, Dr. Notch testified Freeman was competent to understand what a will was. He testified "Each time [Freeman] was discharged from the hospital he was seen as he [sic] competent. During hospitalization sometimes he was not." During his examination by Brannon's attorney, Dr. Notch was specifically asked to opine on whether he believed Freeman "knew and understood the nature and extent of his property at the time—had that capacity at the time he was released from the VA hospital." Over objection, Dr. Notch responded, "The opinion is that—that it would have been part of his remote knowledge because he was aware of the farm, the extent of the acreage, the location, and he would have known what they were talking about, it would occur to me, in my opinion." He was asked for his opinion

"as to whether, when [Freeman] was released from VA hospital, [Freeman] had the capacity to remember the natural objects of his bounty, who he was going to give property to in his will." Over objection, Dr. Notch opined, "[Freeman] would have been able to understand because of his remote memory, and that would have been fairly intact because that doesn't change over time." Dr. Notch was asked if he had "an opinion at—when [Freeman] was released from VA hospital whether or not he had the ability to know the disposition he—or he desired to make in his will." Over objection, Dr. Notch answered, "Yes. At the time [Freeman's] remote knowledge would have been adequate for him to understand in succeeding years. The difficulty I have is that—that the last hospital record was '77 that I saw, and the wills were not until quite some time later." As discussed above, the court stated in the findings of facts: "From the records and materials reviewed by Dr. Notch, he found Freeman competent at the time the will was executed." Dorothy Ruth argues that finding meant the court relied on Dr. Notch's opinion prejudicial to her.

It appears the probate court was merely reciting Dr. Notch's testimony—i.e., "this is what he said"—in the findings of fact, rather than an adoption or even acceptance of Dr. Notch's opinion. The court did not appear to rely on the challenged testimony in its conclusions, only stating, "Doctor Notch testified that, if Freeman had been suffering from schizophrenia at the time he traveled to Kennedy's office for the drafting of his will, Freeman would have experienced hallucinations and delusions, which would have been apparent to Kennedy and his staff." While the admission of expert testimony is largely within the discretion of

the court,[3] whether Freeman was competent to execute a will in 1977 is far removed from his ability to execute a will in 2011. Even if admitted in error, the testimony was harmless. There was sufficient evidence Freeman had the legal capacity to execute the contested will. There is no evidence the court relied solely on Dr. Notch's opinion about Freeman's competence in reaching its conclusion. Insofar as the doctor's opinions should not have been admitted, the admission was harmless. *See Stumpf v. Reiss*, 502 N.W.2d 620, 623 (Iowa Ct. App. 1993). We discern no abuse of discretion under the facts of the case.

### D. Undue Influence.

Lastly, we address Dorothy Ruth's claim that Freeman was unduly influenced in making his bequeaths to certain family members in his will.

> Undue influence means a person substitutes his or her intentions for those of the person making the will. The will then expresses the purpose and intent of the person exercising the influence, not those of the maker of the will. Undue influence must be present at the very time the will is signed and must be the controlling factor. The person charged with exercising undue influence need not be personally present when the will was being made or signed but the person's influence must have been actively working at the time the will was being made and signed.

*Burkhalter v. Burkhalter*, 841 N.W.2d 93, 96 (Iowa 2013). Undue influence is intertwined with the issue of lack of testamentary capacity so they are nearly impossible to separate. *See In re Estate of Olson*, 451 N.W.2d 33, 36 (Iowa Ct.

---

[3]*Johnson v. Am. Family Mut. Ins.*, 674 N.W.2d 88, 91 (Iowa 2004). "We are committed to a liberal rule on admissibility of opinion testimony, and only in clear cases of abuse would the admission of such evidence be found to be prejudicial." *Heinz v. Heinz*, 653 N.W.2d 334, 341 (Iowa 2002) (quoting *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999)). "We give district courts wide latitude in receiving expert testimony during a bench trial." *Metro. Prop. & Cas. Ins.*, 924 N.W.2d at 839 (citing *Heinz*, 653 N.W.2d at 341. Furthermore, "[t]o establish an abuse of that discretion, it must be shown that it was exercised on untenable grounds or was clearly erroneous." *Brunner v. Brown*, 480 N.W.2d 33, 37 (Iowa 1992)).

App. 1989). "One who is infirm is more susceptible to undue influence than one who is not." *Id.* (quoting *Frazier v. State Cent. Sav. Bank*, 217 N.W.2d 238, 243 (Iowa 1974)). "Conduct which might be insufficient to influence unduly a person of normal mental strength might be sufficient to operate upon a failing mind." *Id.* (quoting *Frazier*, 217 N.W.2d at 243).

> In order to set aside a will on grounds of undue influence, contestants must prove that: (1) the testator was susceptible to undue influence; (2) defendants had an opportunity to exercise undue influence and effect the wrongful purpose; (3) defendants had a disposition to influence unduly to procure an improper favor; and (4) the result, reflected in the will, was clearly the effect of undue influence.

*In re Estate of Bayer*, 574 N.W.2d 667, 670-71 (Iowa 1998). Although "direct proof is rarely available in such contests, undue influence may be proven by circumstantial evidence." *Dankbar*, 430 N.W.2d at 128.

> The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the making of the testament itself. Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an inference of its existence.

*Henrich*, 389 N.W.2d at 83 (cleaned up).

Even if Freeman was susceptible to influence, Dorothy Ruth offers no evidence, direct or circumstantial, that Freeman was influenced by anyone to procure a beneficiary status in his will. She only has bare suspicions; that simply is not enough. The district court did not err in concluding Dorothy Ruth failed to prove Freeman's will resulted from undue influence.

### *III. Conclusion.*

For all these reasons, we affirm the ruling of the probate court dismissing Dorothy Ruth's petition, sustaining Brannon's directed verdict as to the claim of undue influence, and sustaining Scott Adams's petition for probate of Freeman's will.  Any costs on appeal are assessed to Dorothy Ruth.

**AFFIRMED.**